[S. F. No. 22241.   In Bank.   Sept. 13, 1968.]

CLARENCE B. HARVEY et al., Plaintiffs and Respondents,
v. HENRY D. DAVIS et al., Defendants and Appellants.

Field, DeGoff & Rieman and Sidney F. DeGoff for Defendants and Appellants.

Weir, Hopkins, Jordan & Mitchell, Weir, Hopkins, Donovan & Zavlaris, John F. Hopkins and Robert H. Weir for Plaintiffs and Respondents.

Thomas C. Lynch, Attorney General, Herbert E. Wenig, Assistant Attorney General, and Burch Fitzpatrick, Deputy Attorney General, as Amici Curiae on behalf of Plaintiffs and Respondents.

TRAYNOR, C. J.—In February 1963 plaintiffs Clarence and Stella Harvey, who owned improved real property in Los Gatos, listed the property for sale with Grant Rowe, a licensed real estate broker. Defendant Henry Davis answered Rowe's advertisement of the property and expressed interest in buying it for himself and his wife. After preliminary negotiations, the Davises submitted a written offer through Rowe to exchange for the property notes of a face value of $80,000 secured by deeds of trust to be approved by the Harveys. Rowe told Davis that the Harveys were willing to make the exchange. Davis got in touch with the Rylee Mortgage and Investment Company and learned that it had a package of 32 notes secured by second deeds of trust that Davis could purchase at a substantial discount. Twenty-four of the notes had a face value of $80,000. Davis instructed Rylee to show Rowe and Harvey the 24 notes and deeds of trust and the property securing them. He told Rylee that if Harvey approved the notes and deeds of trust, the Davises would buy the whole package of 32 notes and arrange for Rylee to sell the remaining eight to some other buyer or buyers. Harvey approved the 24 notes and deeds of trust, and the Davises bought them through Rylee for $52,000. They placed them in escrow together with an assignment to the Harveys and they were delivered to the Harveys on closing the escrow.

Each note was for $3,350 at 7.2 percent interest and was one of a series of notes each of which was secured by a second deed of trust on a different lot in a subdivision in Santa Clara County. Each had been executed on January 10, 1963, by defendants Joseph E. Strawther and Bobbie Gene Strawther on behalf of their *alter ego* defendant Canary Construction Company as obligor and in favor of their *alter ego* defendant Portola Enterprises as obligee. When the Harveys took the notes in exchange for their real property, the first deeds of trust on the properties securing the notes were already in default, and the holder of the first deeds of trust started foreclosure proceedings a few days later. After the foreclosures the notes secured by the second deeds of trust were worthless.

The Harveys brought this action against Mr. and Mrs. Davis, the Rylee Mortgage Company, Joseph and Bobbie Strawther, Portola Enterprises, the Canary Construction Company, and others. They alleged three causes of action : one based on fraud, one based on violations of the Real Property Securities Dealers Act, and one for money had and received,

After a nonjury trial, the court entered judgment against the defendants named above for damages suffered by plaintiffs from defendants' failure to comply with the provisions of the Real Property Securities Dealers Act. Only the Davises appeal.

The Real Property Securities Dealers Act (Bus. & Prof. Code, § 10237 et seq.) was enacted in 1961 to protect the investing public by regulating the marketing of highly speculative promotional subdivision second trust deeds and sales contracts. (See Final Report of the Subcom. on Real Estate Contracts and Trust Deeds, 2 Journal of the Assembly (Reg. Sess. 1961) Appendix, 23 Assembly Interim Com. Report No. 15; "Trust Deed Securities, The Ten Percent Business," Report of the Attorney General to the Legislature, March 1961; Mayer, *Protection of the Investor in Real Estate and Real Property Securities in California* (1962) 9 U.C.L.A. L.Rev. 643, 656-664.)[1] It contains comprehensive provisions designed to keep worthless promotional securities like those involved in this case off the market. A person dealing in real property securities as defined in the act[2] must be a licensed real estate broker who has secured an endorsement to his license to act as a real property securities dealer (§ 10237.3),

[1]Appended to the act as passed was the following explanation:

"Emergency legislation controlling and regulating the market in mortgages and trust deeds was enacted at the 1960 (First Extraordinary) Session of the Legislature. Since that legislation became effective serious irregularities in the mortgage market have been discovered and the investments of many people have been placed in great jeopardy. This deplorable situation was discussed in the 'Final Report of the Subcommittee on Real Estate Contracts and Trust Deeds,' of the Assembly Interim Committee on Judiciary—Civil, dated December 1960. The Legislature finds that the bulk of promotional trust deeds as herein defined were sold by so-called trust deed companies and brokers, purchasing and selling such notes and real property sales contracts developed through subdivision financing. As was pointed out in the report of the Attorney General to the Legislature on 'Trust Deed Financing,' dated March 1961, such notes and real property sales contracts were sold upon appraisals of value far in excess of actual fair market value and subjected the purchasing public to all the financial risks in subdivision promotion and construction. Millions of dollars have been lost by investors through numerous defaults on such notes and real property sales contracts. Permanent legislation is urgently needed to provide uniform and effective regulation, and to give stability to the mortgage and trust deed market."

[2]The 1961 version of the Real Property Securities Dealers Act was effective on the date these transactions took place. Since then, the Legislature has amended the act three times. All references, unless otherwise specified, are to the 1961 version of the act and to the Business and Professions Code as of that date.

Section 10237.1 defines a real property security to include:

"(b) One of a series of promotional notes secured by liens on separate parcels of real property in one subdivision or in contiguous subdivisions.

and he must file a bond and annual reports with the Real Estate Commissioner. (§§ 10237.8, 10237.9.) No real property security may be sold[3] to the public unless a permit is obtained from the Real Estate Commissioner. (§ 10238.3) Before becoming obligated, purchasers of such securities must be presented with a financial statement setting forth essential facts bearing on the value of the securities and the dealer's estimate of that value (§§ 10237.4, 10237.5). Appraisals must be made of the properties involved (§ 10237.6), and the commissioner may prevent deceptive advertising (§ 10237.7). Every person sustaining an injury from a violation of the act may recover damages from the real property securities dealer involved.[4] Criminal penalties are provided for wilful violations (§ 10238.6).

In the present case, the trial court found that the notes and deeds of trust that the Davises sold to the Harveys were real property securities within the meaning of section 10237.1, that the Harveys were not provided with the financial statement required by sections 10237.4 and 10237.5, and that no permit was obtained for the sale of the notes and deeds of trust. It found that the Davises were principals in the transaction as

"(c) One of a series of real property sales contracts pertaining to separate parcels of real property in one subdivision or in contiguous subdivisions, all of which are executed by one person or persons associated together as owners.

". . . . . . . .

"As used in this section 'promotional note' means a promissory note secured by a trust deed executed on unimproved real property, or executed after construction of an improvement of the property but before the first sale of the property as so improved, or executed as a means of financing the first purchase of the property as so improved, and which is subordinate or which by its terms may become subordinate to any other trust deed on the property, except when such note was executed in excess of three (3) years prior to being offered for sale.

"Subdivisions (b) and (c) of this section do not apply to a person who sells or exchanges a note or contract through a real property securities dealer."

[3]Section 10237.2 provides: "As used in this article 'sale' or 'sell' includes every issuance, creation for resale, disposition or attempt to dispose of a real estate security for value and includes all of the following, whether done directly or by circular letter, advertisement, radio or television broadcast or otherwise: an offer to sell, an attempt to sell, a solicitation of a sale, a contract of sale or an exchange."

[4]Section 10239.4 provides: "Every person sustaining an injury resulting from a transaction subject to this article which was in violation of the provisions of the article may recover in a civil action against the real property securities dealer the amount of the damages with interest at 7 percent per annum from the date of the injury, and shall be entitled to be awarded a reasonable attorney's fee. Any such action shall be brought within two (2) years from the date of the transaction or the date the injury was discovered, whichever is the later."

defined in section 10237 and concluded that they were liable for damages and attorney's fees under section 10239.4.

Section 10237 defines a real property securities dealer as "any person, acting as principal or agent, who engages in the business of: (a) Selling real property securities to the public, . . ." and section 10239.4 provides for the recovery of damages and attorney's fees from such a dealer. In view of the fact that the trial court held the Davises liable under section 10239.4, the only reasonable interpretation of its finding that they were principals as defined in section 10237 is that they were real property securities dealers engaged in the business of selling real property securities to the public.

The Davises contend that there is no evidence to support the trial court's finding on the ground that all that appears is an isolated transaction in which they did no more than exchange for the Harveys' real property precisely what the Harveys asked. They urge that such purchasers of real property can in no sense be deemed to be engaging in the business of selling real property securities to the public, particularly when the transaction is not initiated by them.

Although there is no evidence that the Davises sold any real property securities other than the 24 notes and deeds of trust sold to the Harveys, the evidence fully supports the conclusion that they engaged in the business of selling real property securities to the public. By answering the newspaper advertisement of the Harveys, persons whom they had never known and with whom they dealt exclusively through agents, the Davises indicated a willingness to conduct business with members of the public chosen at random. (*Securities & Exchange Com.* v. *Ralston Purina Co.* (1953) 346 U. S. 119, 125, fn. 11 [97 L.Ed. 1494, 1498, 73 S.Ct. 981]; *Mary Pickford Co.* v. *Bayly Bros., Inc.* (1939) 12 Cal.2d 501, 514-515 [86 P.2d 102].) Although it was apparently not carried out, their plan to buy and sell the remaining eight notes and deeds of trust is also evidence of such willingness. By arranging to pay for property worth approximately $80,000 with notes and deeds of trust that they could secure for $52,000, they demonstrated that the controlling business purpose of the transaction was not the purchase of the Harveys' real property but the retailing of 24 notes and deeds of trust at a profit of $28,000. It is immaterial that the Harveys initiated the transaction by putting their real property on the market and may have stipulated that the price be paid in notes secured by deeds of trust instead of cash. The Real Property Securities Dealers Act,

like similar regulatory statutes, presupposes willing buyers, indeed they are the very persons such legislation is designed to protect. Had the Davises complied with the act and delivered the financial statement required by sections 10237.4 and 10237.5, it is inconceivable that the Harveys would have parted with property worth $80,000 in exchange for notes and deeds of trust that could be purchased for $52,000 and that were actually worthless.

The conclusion that the Davises were engaged in the business of selling real property securities to the public within the meaning of section 10237 when they sold the 24 notes and deeds of trust to the Harveys, is supported by related provisions of the Business and Professions Code. When the Legislature enacted the Real Property Securities Dealers Act, it also enacted section 10131.1 of the Business and Professions Code to broaden the definition of a real estate broker to include ''a person who engages as a principal in the business of buying from, selling to, or exchanging with the public, real property sales contracts or promissory notes secured directly or collaterally by liens on real property, . . .'' That section defines ''in the business'' to mean the acquisition for resale to the public or the sale or exchange with the public of three or more real property sales contracts or secured promissory notes per year. Thus, in section 10131.1 the Legislature defined engaging in business in terms of the number of contracts or notes sold instead of in terms of the number of transactions involved. It would be unreasonable to assume that the Legislature used the same words, ''engages in the business of,'' in the Real Property Securities Dealers Act, to regulate only greater amounts of business activity than are defined in section 10131.1 of the Business and Professions Code. The Real Property Securities Dealers Act imposes additional and more stringent regulation on those dealing in the more speculative types of real property securities where the need for regulation is presumably the greatest. It is clear, therefore, that a sale of 24 notes secured by deeds of trust constitutes engaging in the business of selling within the meaning of section 10237.

Legislative history also makes it clear that such a sale made to a person selected at random from the public is a sale to the public within the meaning of the act. The requirement of a sale to the public as a prerequisite to regulation was not in the bill as introduced in the 1961 session of the Legislature. (A.B. 1344, § 10238.1 (as amended May 22, 1961).) When the

bill was later amended to include the requirement of a sale to the public (A.B. 1344, §§ 10237, 10238.3 (as amended May 30, 1961)), it was also amended to provide that ''The sale to corporations; pension, retirement or similar trust funds; or to institutional lending agencies shall not be deemed a sale to the public for the purposes of this article'' (A.B. 1344, § 10237 (as amended May 30, 1961)). In 1963 attorneys and real estate broker licensees were added to the list of excluded purchasers (§ 10237.25, added Stats. 1963, ch. 1291, p. 2817, § 4), and in 1965 general building contractor licensees were also added. (§ 10237.25 as amended Stats. 1965, ch. 1796, p. 4133, § 2.) Thus, the Legislature has defined the public to exclude groups of buyers that would appear to be either experts in the field of investments or to be well informed in the field of real estate transactions. ■ Accordingly, in determining whether a sale is to the public within the meaning of sections 10237 and 10238.3 the distinction is not between sales to one or a few and sales to many persons but between sales to those whom the Legislature deemed able to protect themselves and sales to those deemed unable to do so.

■ The remaining question is whether the Davises are exempted from civil liability by the provision of section 10237.1 that ''Subdivisions (b) and (c) [defining real property securities] do not apply to a person who sells or exchanges a note or contract through a real property securities dealer.''[5]

The Davises contend that they sold the notes and deeds of trust through Rylee, a real property securities dealer, and that the exemption applies whether or not Rylee was licensed as such a dealer. There is no merit in these contentions.

The evidence supports the trial court's findings that the Davises were principals in the Davis-Harvey transaction and that Rylee was exclusively the agent of Portola, Canary, and the Strawthers. The Davises did not sell the notes and deeds of trust through Rylee. Instead, they bought them from Rylee, acting as agent for Portola, and sold them to the Harveys. Although the sale was negotiated by Davis with Rowe, Rowe was not the Davises' agent to sell the notes and deeds of trust but the Harveys' agent to sell their property. In any event,

---

[5] In 1963 this paragraph was deleted from section 10237.1 and its substance incorporated in the definition of a real property securities dealer in section 10237: ''A person who sells or exchanges a real property security as defined by subdivisions (b) or (c) of Section 10237.1 through a real property securities dealer shall not be deemed to be a real property securities dealer because of such sale or exchange.''

Rowe was not a real property securities dealer. Accordingly, the sale was not made through a real property securities dealer within the meaning of the exemption.

To hold otherwise would create a serious gap in the regulatory scheme. Section 10237.4 requires the real property securities dealer to provide the buyer with the financial statement describing the securities before the buyer becomes obligated to complete the transaction. Since Rylee did not sell the notes and deeds of trust to the Harveys, but merely allowed Harvey to inspect them at Davis' request, Rylee was under no obligation to furnish a financial statement to the Harveys. It could have complied with section 10237.4 by providing the required financial statement to the Davises. If, however, Rylee's sale to the Davises to enable them to sell to the Harvey's rendered the latter sale a sale conducted through a real property securities dealer within the meaning of section 10237.1, no one would be obligated to furnish the Harveys with a financial statement and the statutory purpose to protect them as potential purchasers would be defeated.

■ Moreover, even if the sale had been made through Rylee within the meaning of section 10237.1, it would be incumbent on the Davises to prove that Rylee was a licensed real property securities dealer to bring the exemption into play. The exemption reflects a legislative determination that adequate protection will be afforded members of the public if they deal with real property securities dealers who are fully responsible for complying with the act. Such protection would be substantially vitiated if an owner of real property securities could sell them through an unlicensed dealer without incurring any responsibility on his own part to comply with the act. The purpose of the act to protect the investing public precludes such an interpretation.

■ There is obviously no merit in the contention that to interpret the words real property securities dealer in the exemption to mean a licensed dealer requires the same interpretation whenever those words occur in the act. To so hold would lead to the ridiculous result of excusing all persons selling real property securities to the public from complying with the act unless they elected to become licensed under section 10237.3. The contention overlooks the essential distinction between exemption and coverage provisions in regulatory statutes. The former are narrowly construed when such a construction is necessary to accomplish the purposes of the act, and the latter are broadly construed to accomplish those pur-

poses. (See Loss and Cowett, Blue Sky Law (1958) pp. 81-83, 130; 1 Loss, Securities Regulation (1961) pp. 710-713; *Securities & Exchange Com.* v. *Ralston Purina Co., supra,* 346 U.S. 119; *Silver Hills Country Club* v. *Sobieski* (1961) 55 Cal.2d 811, 814 [13 Cal.Rptr. 186, 361 P.2d 906, 87 A.L.R.2d 1135]; *Mary Pickford Co.* v. *Bayly Bros., Inc., supra,* 12 Cal.2d 501, 514.)

The judgment is affirmed.

McComb, J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

Appellants' petition for a rehearing was denied October 9, 1968.