[Crim. No. 6035. Fourth Dist., Div. Two. June 5, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH J. FRANKLIN MANCHA, Defendant and Appellant.

## Counsel

Jack Altman and Marshall S. Mayer for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, and Daniel J. Kremer, Harley D. Mayfield and Richard D. Garske, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**TAMURA, J.**—Defendant and his wife were indicted on 48 counts of selling real property securities in violation of the Real Property Securities Dealers Act (Bus. & Prof. Code,[1] § 10237 et seq.) (24 counts were for violations of § 10238.3[2] and 24 counts for violations of § 10237.4),[3] 24

---

[1]The Real Property Securities Dealers Act will be referred to as the "Act." All section references, unless otherwise indicated, are to the Business and Professions Code.

[2]Section 10238.3 provides: "No real property security as defined in Section 10237.1 shall be sold to the public without either 'the issuer or the real property securities dealer first obtaining a permit from the commissioner."

[3]Section 10237.4 provides: "Every person selling a real property security shall personally sign and deliver to the purchaser a statement in writing, containing all the information required by Section 10237.5, before the purchaser shall be obligated to complete the transaction. No seller shall permit the purchaser to sign the statement if any information required by Section 10237.5 is omitted. The seller shall retain an executed copy of the statement for four years."

Section 10237.5 provides: "The statement required by Section 10237.4, the form of which shall be approved by the commissioner, shall be approved by the commissioner and shall include the following information

"(a) Legal description or address of the property subject to the lien securing the note or contract being made or sold.

"(b) The name and address of the fee owner of the property subject to the lien securing the note or contract being made or sold.

"(c) Available information relative to the ability of the person liable on the obligation to meet his contractual payments.

"(d) Any improvements on the property or the absence thereof.

"(e) Any streets, sewers, water mains, curbs and gutters on or adjacent to the property or the absence thereof.

"(f) Terms and conditions of the contract or note being made or sold, including the principal balance owing thereon, and the status of principal and interest payments thereon.

"(g) A statement of the approximate balloon payment on the note or contract being made or sold shall appear prominently in words and figures.

"(h) Insofar as it is available, the terms and conditions of all prior recorded

counts of grand theft and 1 count of conspiracy to commit grand theft and to violate the Act. Defendant was also alleged to have suffered a prior felony conviction for conspiracy to commit grand theft. The indictment was subsequently dismissed in its entirety as to defendant's wife and 13 of the grand theft counts were dismissed as to defendant. The cause went to trial on the remaining counts.

Defendant waived a jury, admitted the charged prior, and, pursuant to stipulation, the People's case was submitted on the transcript of the grand jury proceedings. Defendant's motion for acquittal pursuant to Penal Code section 1118 was granted as to the conspiracy count but was denied as to the others. Thereafter the defense put on its case.

The court found defendant not guilty on the grand theft counts but found him guilty on the 48 counts of violations of the Act. Defendant was sentenced to state prison but execution of the sentence was suspended and he was granted probation, subject to certain terms and conditions. Defendant appeals from the judgment (order granting probation).

The basis for the indictment was the sale of 24 $10,000 promissory notes, each secured by a first trust deed on an unimproved lot in a single subdivision known as "Grandview Place" in the City of Riverside. We shall not attempt to review in detail the numerous complex transactions leading to the sale of the notes. For the purpose of resolving the issues raised on appeal, the following summary of those transactions will suffice:

Defendant purchased 30 unimproved lots in the Grandview Place subdivision in 5 separate groups. The purchase escrow for each group of lots provided that title was to be vested in defendant, his wife or the Pacific Group (a partnership consisting of defendant and his wife). During the pendency of the purchase escrows, defendant opened loan escrows at a different escrow company, ostensibly to consummate a $10,000 loan to defendant on each lot from Franklin Associates (another partnership composed of defendant and his wife); for each $10,000 loan they showed

---

encumbrances which constitute liens upon the property, the principal balance of said encumbrances, and the status of principal and interest payments thereon.

"(i) Amounts and terms of tax liens and assessments, insofar as they are available.

"(j) A written statement of the dealer's considered opinion of the current fair market value of the property and of the equity therein securing the note or contract.

"(k) Whether the dealer is acting as a principal or as an agent.

"(l) A statement that the transaction is in compliance with the provisions of this part.

"In addition, the statement shall set forth such additional information as the commissioner may by rule or regulation adopted pursuant to Chapter 4 (commencing with Section 11370) of Part 1, Division 3, Title 2 of the Government Code require."

a purported payment of $3,050 to defendant outside of escrow and called for $6,950 to be paid through escrow; each loan was to be evidenced by a $10,000 note secured by a trust deed on one of the lots, executed by defendant and made payable to Franklin Associates; each note was to bear 10 percent interest and was to be paid at the rate of $100 or more per month with the entire balance to be paid at the end of two years.

Defendant thereafter placed an advertisement in the Los Angeles Times for the sale of $10,000 first trust deeds bearing 10 percent interest at a 30 percent discount or $6,950.[4] Responses to the advertisement by various persons led to the sale of the 24 promissory notes.

The following is representative of the manner in which funds in the various purchase and loan escrows were handled:

In one purchase escrow for four lots, the total purchase price was $11,700. However, there was funneled into that escrow $20,381.90 from three loan escrows ($6,793.30, $6,794.30, $6,794.30, respectively). The $20,381.90 was disbursed from the purchase escrow as follows: $11,700 to the seller of the lots and $8,532.55 (the balance, less fees and commissions) to defendant.

The manner in which funds for one of the above loan escrows was obtained is typical of the other 24 transactions:

A Frances May Hammond answered defendant's advertisement in the Los Angeles Times, arranged to meet defendant in Riverside, and was shown lots in the Grandview Place subdivision. Defendant told Mrs. Hammond the lots were worth well over $10,000 each, that the zoning was R-3, and that he was going to build apartments on the lots within two years. Mrs. Hammond agreed to buy one $10,000 note secured by a trust deed on one of the lots. She deposited $6,950 into one of the loan escrows and later received a $10,000 note and trust deed executed by defendant and his wife, payable to Franklin Associates, and assigned to Mrs. Hammond by Franklin Associates. Mrs. Hammond testified she would never have made the investment had she known the money was going to be used by defendant to purchase the lot and had she known the lot was being purchased for less than she paid for the note and trust deed.

---

[4]The advertisement read:
"$10,000 1ST FOR $6950
"30% DISC.—$100% [sic] Security !
BLDR. SACR. $10,000 1st TD. PAYS 10% INT. $100/mo. ea.
All Payable 2 yrs. for $6,950 ea. 429-5290."

The 24 notes were sold to various persons over a period extending from December 1971 through June or July 1972. Each sale was made on substantially the same representations as were made to Mrs. Hammond. In many instances the purchasers testified that defendant stated he already owned the lots and he was going to use the proceeds from the sale of the notes to help defray development costs. Each buyer paid $6,950 for a $10,000 note secured by a trust deed on one of the lots in the Grandview Place subdivision. Some buyers bought more than one note.

Although defendant represented to the purchasers of the notes that the property was zoned R-3, according to an assistant city planning director the property was zoned for single family residences. He testified that on May 2, 1972, the city conditionally approved defendant's application to rezone the property to R-3, but the condition (installation of offsite improvements such as sidewalks, sewers, paving, etc.) had never been met.

In August 1972 the State Real Estate Commissioner caused a cease and desist order to be issued and served upon defendant. From about that time defendant began defaulting on the promissory notes. The evidence before the grand jury revealed that defendant had been the subject of a prior cease and desist order issued by the Real Estate Commissioner in May of 1963 for the sale of notes secured by second trust deeds without complying with the Act.

The records of the Real Estate Commissioner's office disclosed that defendant had never applied for, nor had ever been issued, a permit to sell or issue real property securities as required by section 10238.3. Defendant did not provide any of the purchasers with a statement in writing containing the information required by sections 10237.4 and 10237.5.

The defense introduced testimony from various witnesses to the effect that similar lots in Riverside which were zoned R-3 were selling for $8,000 each. The defense also produced a number of witnesses to show that once the 24 transactions were completed, defendant had either retained or consulted them for the purpose of constructing buildings on the lots. The witnesses included a land surveyor, a building designer, a professional topographer, a general contractor and a heating and air conditioning contractor. The defense also put on an FHA subdivision appraiser who testified that defendant submitted plans and specifications in an effort to have the subdivision in question approved for FHA financing.

Defendant contends: (1) The promissory notes in question were not real property securities as defined by the Act (§ 10237.1) because they were secured by first trust deeds which were neither subordinated nor

could be subordinated; (2) if the Act is construed to cover the trust deeds sold by defendant, the statute would be violative of the due process clause of the Fifth and Fourteenth Amendments; and (3) the People failed to allege or prove criminal violations of the Act.

From the analysis which follows, we have concluded: The promissory notes sold by defendant were real property securities as defined by the Act; as so interpreted, the Act does not violate the due process clause of the Fifth or Fourteenth Amendments; the indictment charged, and the People proved, criminal violations of the Act.

## I

The central issue on this appeal is whether the term "real property security" as defined by section 10237.1 of the Act includes promotional notes secured by first trust deeds on unimproved subdivision lots.

The pertinent portions of section 10237.1 read: "The term real property security as used in this article means:

". . . . . . . . . . . . . . . . .

"(b) One of a series of promotional notes secured by liens on separate parcels of real property in one subdivision or in contiguous subdivisions.

". . . . . . . . . . . . . . . . .

"As used in this section 'promotional note' means a promissory note secured by a trust deed executed on unimproved real property, or executed after construction of an improvement of the property but before the first sale of the property as so improved, or executed as a means of financing the first purchase of the property as so improved, and which is subordinate or which by its terms may become subordinate to any other trust deed on the property; provided that the term 'promotional note' does not include (i) a note which was executed in excess of three (3) years prior to being offered for sale or (ii) a note secured by a first trust deed on real property in a subdivision, which evidences a bona fide loan made in connection with the financing of the usual costs of the development of a residential, commercial, or industrial building or buildings on the property . . . ."

The uncontroverted facts are that defendant sold a series of promissory notes secured by trust deeds on separate unimproved lots in one subdivision. However, defendant contends the notes were not "promotional" within the meaning of section 10237.1 because they were secured by first trust deeds. He urges that the phrase "and which is subordinate

or which by its terms may become subordinate to any other trust deed on the property" in the paragraph defining "promotional note" must be read as modifying not only the category of trust deeds described in the immediately preceding phrase ("executed as a means of financing the first purchase of the property as so improved") but all three categories of promotional trust deeds described in the paragraph. We disagree.

■ It is a settled rule of statutory interpretation that, unless the context or natural construction of the language of the statute requires a different interpretation, a relative or modifying phrase is to be applied to the phrase immediately preceding it and is not to be construed as extending to more remote phrases. (*People* v. *Baker,* 69 Cal.2d 44, 46 [69 Cal.Rptr. 595, 442 P.2d 675]; *Elbert, Ltd.* v. *Gross,* 41 Cal.2d 322, 326-327 [260 P.2d 35]; *County of Los Angeles* v. *Graves,* 210 Cal. 21, 26 [290 P. 444]; *Grant* v. *Hipsher,* 257 Cal.App.2d 375, 383 [64 Cal. Rptr. 892]; *Watkins* v. *Real Estate Commissioner,* 182 Cal.App.2d 397, 399 [6 Cal.Rptr. 191]; *City of Santa Barbara* v. *Maher,* 25 Cal.App.2d 325, 327 [77 P.2d 306].) We find nothing in the language of the statute or the context in which the modifying phrase is used which would require it be made applicable to all three categories of trust deeds described in the section.

■ Under a reasonable grammatical reading of section 10237.1, the three categories of promotional notes are those secured by a trust deed

(1) "executed on unimproved real property," or

(2) "executed after construction of an improvement of the property but before the first sale of the property as so improved," or

(3) "executed as a means of financing the first purchase of the property as so improved, and which is subordinate or which by its terms may become subordinate to any other trust deed on the property; . . ."[5]

The only notes secured by first trust deeds which are excluded from the statutory definition of "promotional notes" are those secured by first trust deeds on improved property executed to finance the first purchase of the property as so improved and those secured by first trust deed to evidence bona fide construction loans. First trust deeds so excluded obviously do not possess the promotional and speculative features of first trust deeds

[5]As originally introduced, the measure (AB 1344) did not include the qualifying phrase in question in the definition of "promotional notes." The phrase was added by a later amendment to the bill. Had the intention been to restrict the definition of "promotional note" in its entirety to those secured by subordinated trust deeds, it is reasonable to assume that more specific and appropriate language would have been employed.

on unimproved lots in a subdivision such as are involved in the present case. In the case at bench, the investors had no assurance that the property would ever be improved and much less that the sums invested would be devoted to the improvement of the property. The specific exclusion of certain types of first trust deeds imports the inclusion of all other types. ▮ "A 'familiar rule of construction is that where a statute enumerates things upon which it is to operate it is to be construed as excluding from its effect all those not expressly mentioned.'" (*Capistrano Union High School Dist.* v. *Capistrano Beach Acreage Co.,* 188 Cal.App.2d 612, 617 [10 Cal.Rptr. 750, 92 A.L.R.2d 349]; *Shelby* v. *Southern Pacific Co.,* 68 Cal.App.2d 594, 599 [157 P.2d 442]; *In re Peart,* 5 Cal.App.2d 469, 472 [43 P.2d 334].)

The foregoing is the interpretation placed upon section 10237.1 by Mr. Marshall S. Mayer in his article *Protection of the Investor in Real Estate and Real Property Securities in California* (1962) 9 U.C.L.A. L. Rev. 643, 662. He explains the purpose of the qualifying phrase in category (3) as follows: "In order to exempt legitimate *first deeds of trust on improved property* from the definition of a promotional note, [category (3)] was qualified to include only notes which were or could be subordinated to another lien." (Italics supplied.) ▮ Mr. Mayer was counsel for the State Division of Real Estate when the Act was passed in 1961 and testified before the assembly subcommittee, whose exposure of abuses in the mortgage and trust deed business led to the passage of the Act. (See Final Report, Assembly Subcommittee on Real Estate Contracts and Trust Deeds, 2 Assem. J. (1961 Reg. Sess.) 23 Assem. Interim Com. Report No. 15, p. 42.) Because of his familiarity with the problems leading to the enactment of the statute, his interpretation of section 10237.1 is entitled to great respect.

The State Division of Real Estate has also consistently so read the statutory definition of "promotional note." In its 1962 edition of the Real Estate Reference Book, "promotional note" is defined as being "a note secured by a trust deed on unimproved real property; or a note executed after construction of an improvement on the property, but before the first sale; or executed as a means of financing the purchase of property as so improved, and which is subordinated to another trust deed." (Cal. Div. of Real Estate Reference Book (1962 ed.) Broker Acting as Loan Agent, ch. 22, p. 357.[6]) The separation of each category of trust deed by a

---

[6]The 1973 Reference Book contains substantially the same language. At page 335, "promotional note" is defined as referring to "a note secured by a trust deed on unimproved real property in a subdivision; or a note executed after construction

semicolon indicates that the Real Estate Commissioner interpreted the modifying clause in question to apply only to trust deeds executed as a means of financing the first purchase of the property as improved. "[T]he contemporaneous interpretation of a statute by an administrative agency charged with its enforcement and interpretation, while not controlling or required to be inevitably followed, is entitled to great weight unless it is clearly erroneous or unauthorized . . . ." (*Crumpler* v. *Board of Administration,* 32 Cal.App.3d 567, 578 [108 Cal.Rptr. 293]; *Rivera* v. *City of Fresno,* 6 Cal.3d 132, 140 [98 Cal.Rptr. 281, 490 P.2d 793]; *Cannon* v. *Industrial Acc. Comm.,* 53 Cal.2d 17, 22 [346 P.2d 1]; *Coca-Cola Co.* v. *State Bd. of Equalization,* 25 Cal.2d 918, 921 [156 P.2d 1].) ▮ The Real Estate Commissioner being the one charged with the enforcement of the Act (§ 10238.2), his contemporaneous construction of the Act, although not necessarily controlling, is entitled to considerable weight.

The foregoing interpretation of the term "promotional note" comports with the legislative intent and objective of the Act. "[T]he objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in its interpretation." (*Rock Creek etc. Dist.* v. *County of Calaveras,* 29 Cal.2d 7, 9 [172 P.2d 863]; *People* v. *United National Life Ins. Co.,* 66 Cal.2d 577, 595-596 [58 Cal.Rptr. 599, 427 P.2d 199].) The application of that principle inevitably leads us to the conclusion, as we shall show, that the Act was intended to cover the type of notes sold by defendant.

Defendant urges that the legislative history of the Act indicates that it was only intended to regulate promissory notes secured by junior trust deeds. He refers us to various portions of the March 1961 Attorney General's report to the Legislature entitled "Trust Deed Securities, The Ten Percent Business" (hereafter "Attorney General's report") to support his thesis that the Act was passed to deal solely with the sale of junior trust deeds. A review of the Attorney General's report shows, however, that his recommendation for legislative action was not so limited in scope.

It is true that the impetus for legislative action came from the collapse of the "Ten Percent Business"—the business of procuring funds from the public for investment in discounted promissory notes secured by second trust deeds designed to produce a 10 percent return. An assembly sub-committee conducted extensive hearings throughout the state exposing

of an improvement on the property, but before the first sale; or executed as a means of financing the first purchase of property as so improved, and which is subordinated to another trust deed."

the evils of the "Ten Percent" operation and reported its findings to the Legislature. (Final Report, Assembly Subcommittee on Real Estate Contracts and Trust Deeds, 2 Assem. J. *supra,* 23 Assem. Interim Com. Report No. 15.) However, the subcommittee did not undertake to make specific legislative proposals.

Recommendations for specific corrective legislative action came from the Attorney General. The Legislature had requested the Attorney General to investigate trust deed companies selling "Secured 10 Per cent Investment Plans," to review the adequacy of existing regulations, and to report his findings and recommendations to the Legislature. (Assem. Con. Res. No. 31, March 26, 1960.) While the report attributed the collapse of the "Ten Percent Business" to the manufacture and sale of discounted second trust deeds on raw land subdivisions which did not ripen into successful subdivisions, it recommended comprehensive legislation dealing with all public offerings of real property securities issued on single parcels of real property. The report noted the inadequacy of existing regulatory statutes and the existence of considerable confusion respecting the jurisdictional control as between the Corporations Commissioner and the State Real Estate Commissioner over the sale of promotional notes secured by trust deeds and recommended that unified control over the sale of all real estate securities be placed under the jurisdiction of the Real Estate Commissioner.

The report also pointed out that under the State Subdivision Law (§ 11000 et seq.) as it then read, before an owner or subdivider may sell lots he must file a report with the Real Estate Commissioner containing all pertinent information concerning the subdivision development including the condition of the title, the terms and conditions on which lots are to be sold, provisions that have been made for utility service such as water, electricity, gas, telephone and sewage facilities, a statement of the soil conditions supported by engineering reports, and other pertinent facts bearing upon the condition of the property (§ 11010), that such report is a public record, and that a copy of the report of the Real Estate Commissioner authorizing the sale of the lots must be furnished to each prospective purchaser of lots in the subdivision (§ 11018.1). The Attorney General observed that the information contained in the subdivider's report would have an important bearing upon the value of any trust deed placed on the subdivision lots, but that the subdivision law was only directed toward protection of the lot buyer and not of an investor relying upon the value and sales prospects of the property as security for payment of his note. He urged that like information should be required to be provided to investors in trust deeds.

Based upon his investigations and findings, the Attorney General concluded: It is entirely evident that the existing piecemeal, halfway legislation is inadequate and should be repealed. *Promissory notes secured by liens on single parcels of real property are recognized as securities and, when offered and sold to the public, should be regulated.* In buying these individual notes and deeds of trust and investment plans, the purchasing public should be afforded a protection at least equal to that provided in the sale of other types of securities. If anything, the regulation should be even more constrictive. The deeds of trust being offered are *usually* junior securities. Heretofore, only the knowledgeable and well-financed investor ventured his capital on second or third deeds of trust. Today, the investors in second deeds of trust are unsophisticated—the typical small investor, middle salaried groups, widows, and retired persons, usually removing life savings from banks and savings and loan associations, in response to the siren call of a higher return with safety.

"A mere disclosure statute is not the answer. The type of investor currently attracted by this kind of investment is unable to assess or check properly the facts presented. In describing and criticising the operation of the 'Ten Percenters' it is realized that there is nothing inherently wrong in selling a second deed of trust at a discount, either as a principal or as a broker for a commission, and that there are a number of corporations and brokers who legitimately deal in discounted second notes for the purpose of producing the high return of 10 per cent or even higher. We are also mindful that there are many brokers who sell *discounted notes which are secured by first deeds of trust. However, the ambit of the statute cannot be efficiently limited to unsound second deeds of trust or dishonest brokers.* The real estate industry has long condemned the practices of the unscrupulous sellers of trust deeds and investment plans. However, in the words of the Attorney General of another state, it raises 'the basic dilemma inherent in the tug of war between the desire for an orderly society and the desire for personal freedom—for restraint upon the other fellow but not on yourself.' The statutory aim should be at the evils. A balance must be attained between the burden upon the honest sellers of trust deeds and the dangers to the investing public." (Atty. Gen. Rep., pp. 34-35; italics supplied.)

The Attorney General recommended the enactment of a statute which would:

"1. *Encompass all real estate securities* offered to the public which are based upon promissory notes secured by deeds of trust on single parcels

of real property or by whole interest in such parcels such as land sales' contracts.

"2. Require separate licensing of persons mainly engaged in the issuance and sale of such real estate securities.

"3. Provide quality standards for trust deeds.

"4. Prohibit the taking of advance money.

"5. Require bonding.

"6. Place control under one agency.

"7. Provide for a preview of advertising.

"8. Authorize a conversation for dealers who are in a hazardous financial condition." (Atty. Gen. Rep., pp. 35-36; italics supplied.)

The Act as passed by the Legislature embodies those basic objectives. It provides comprehensive regulations over the sale of promotional trust deeds on single parcels of real property.[7] A person dealing in real property securities as defined by the Act must be a licensed real estate broker who has secured an endorsement to his license to act as a real property securities dealer (§ 10237.3) and must file a bond with the Real Estate Commissioner (§ 10237.8); no real property security may be sold to the public without a permit from the Real Estate Commissioner (§ 10238.3); before a purchaser shall be obligated to complete the transaction, the person selling a real property security must sign and deliver to the purchaser a state-

---

[7]The Act was passed as an urgency measure. The legislative declaration of the facts constituting the urgency is as follows: "Emergency legislation controlling and regulating the market in mortgages and trust deeds was enacted at the 1960 (First Extraordinary) Session of the Legislature. Since that legislation became effective serious irregularities in the mortgage market have been discovered and the investments of many people have been placed in great jeopardy. This deplorable situation was discussed in the 'Final Report of the Subcommittee on Real Estate Contracts and Trust Deeds,' of the Assembly Interim Committee on Judiciary—Civil, dated December, 1960. The Legislature finds that the bulk of promotional trust deeds as herein defined were sold by the so-called trust deed companies and brokers, purchasing and selling such notes and real property sales contracts developed through subdivision financing. As was pointed out in the report of the Attorney General to the Legislature on 'Trust Deed Financing,' dated March 1961, such notes and real property sales contracts were sold upon appraisals of value far in excess of actual fair market value and subjected the purchasing public to all the financial risks in subdivision promotion and construction. Millions of dollars have been lost by investors through numerous defaults on such notes and real property sales contracts. Permanent legislation is urgently needed to provide uniform and effective regulation, and to give stability to the mortgage and trust deed market." (Stats. 1961, ch. 886, p. 2345, § 36.)

ment setting forth essential facts bearing upon the value of the security such as the existence or nonexistence of improvements on the property, existence or absence of offsite improvements, financial statement of the obligor, and the dealers' considered opinion of the true fair market value of the property (§§ 10237.4, 10237.5); unless the purchaser waives it, an appraisal must be made of each parcel of real property relating to a transaction subject to the Act, either by the real property security dealer or by an independent appraiser (§ 10237.6); advertising material must be submitted to the Real Estate Commissioner before being used (§ 10237.7); a person injured as a result of a violation of the Act may recover damages, including reasonable attorney fees (§ 10238.7); and criminal penalties are provided for willful violations of the Act (§ 10238.6).

To give the statute the restrictive interpretation urged by defendant would seriously impair the efficacy of the Act and thwart its objectives. It would provide an unintended loophole for evasion of the Act. The evils which led to the passage of the Act—deceptive advertising luring unwary, unsophisticated investors with promises of quick, easy profits on "secure investments," use of investors' funds to finance the purchase of unimproved subdivision lands rather than for the development of the property, issuance of trust deeds on raw unimproved subdivision land whose market value is substantially less than the amount for which the securities are sold, overcommitment of funds by financially strapped sellers of real estate securities — all are as likely to be present in the sale of promissory notes secured by first trust deeds on unimproved subdivision lots as in the sale of second trust deeds on such property. The notes sold by defendant had all of the speculative and hazardous characteristics of the promotional notes which led to the collapse of the "Ten Percent Business": The notes were secured by trust deeds on separate unimproved lots in a single subdivision with no offsite improvements; the price of the lots was substantially less than the amount paid for the notes and trust deeds; the notes were sold at 30 percent discount; the notes provided for a minimal $100 per month payment with a large balloon payment at the end of two years; and the funds invested were not earning a return in the economic sense since investors were being paid either from the money which they themselves invested or from money of new investors. We are satisfied that the Legislature did not intend the sale of such notes to go unregulated. ■ We conclude that the Legislature intended the definition of the term "promotional note" to include one of a series of promissory notes secured by trust deeds, whether they be first or second, on separate parcels of unimproved land in a single subdivision.

Defendant refers to a statement in *Harvey* v. *Davis,* 69 Cal.2d 362,

365 [71 Cal.Rptr. 129, 444 P.2d 705], that the Act "was enacted in 1961 to protect the investing public by regulating the marketing of highly speculative promotional subdivision second trust deeds and sales contracts." Since that case involved the sale of second trust deeds, it is not surprising that the opinion referred to their regulation as being the basic aim of the Act. However, as the legislative history of the Act which we have recounted demonstrates, it does not follow that the Act was intended to be limited to the regulation of the sale of second trust deeds.

■ Defendant urges application of the rule that where language in a penal statute is susceptible of two constructions, ordinarily the construction most favorable to defendant will be adopted and the rule that a defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of words or construction of language used in a penal statute. (*People* v. *Nichols,* 3 Cal.3d 150, 162 [89 Cal.Rptr. 721, 474 P.2d 673]; *Keeler* v. *Superior Court,* 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420]; *Walsh* v. *Dept. Alcoholic Bev. Control,* 59 Cal.2d 757, 764 [31 Cal.Rptr. 297, 382 P.2d 337].) Those canons of construction should not be applied to change the manifest, reasonable legislative purpose of the statute. (*People* v. *Banks,* 53 Cal.2d 370, 391 [1 Cal.Rptr. 669, 348 P.2d 102].) Given the grammatical structure of section 10237.1, the legislative history of the Act, and the evils sought to be remedied, section 10237.1 is not reasonably susceptible to the narrow interpretation sought to be placed upon it by defendant.

■ ■ Nor is the statute void for uncertainty. A statute is not void for indefiniteness "if it contains 'a reasonably adequate disclosure of the legislative intent regarding an evil to be combatted in language giving fair notice of the practices to be avoided.'" (*People* v. *Hallner,* 43 Cal. 2d 715, 720-721 [277 P.2d 393]; *People* v. *Deibert,* 117 Cal.App.2d 410, 418 [256 P.2d 355].) The language of the Act in question gives fair notice that the sale of a series of promissory notes secured by trust deeds, whether subordinated or not, on separate unimproved lots in a single subdivision requires a permit from the Real Estate Commissioner and the written disclosure of pertinent information bearing upon the value of the security to prospective purchasers. (Cf. *People* v. *Sears,* 138 Cal.App. 2d 773, 793 [292 P.2d 663] [Corporate Securities Act not invalid for uncertainty].)

## II

Defendant contends that a statute which would regulate an owner's right to sell first trust deeds on his own property would be violative of

the due process clause of the Fifth and Fourteenth Amendments. The contention merits little discussion.

The power of the Legislature to enact laws to prevent fraud and sharp practices in real estate transactions particularly open to such abuses is beyond question. (*In re Sidebotham,* 12 Cal.2d 434, 436 [85 P.2d 453, 122 A.L.R. 496]; *Hesperia Land Development Co.* v. *Superior Court,* 184 Cal.App.2d 865, 875 [7 Cal.Rptr. 815].) ▮▮▮ The state in the exercise of its police power may regulate the enjoyment of property rights whenever reasonably necessary to the protection of the health, safety, morals or general well-being of the people. (*Addison* v. *Addison,* 62 Cal.2d 558, 566 [43 Cal.Rptr. 97, 399 P.2d 897, 14 A.L.R.3d 391].) "[T]here is no vested right to conduct a business free of reasonable governmental rules and regulations . . . ." (*Northern Inyo Hosp.* v. *Fair Emp. Practice Com.,* 38 Cal.App.3d 14, 23 [112 Cal.Rptr. 872]; see *Bixby* v. *Pierno,* 4 Cal.3d 130, 145-146 [93 Cal.Rptr. 234, 481 P.2d 242]; *Beverly Hills Fed. S. & L. Assn.* v. *Superior Court,* 259 Cal.App. 2d 306, 316-317 [66 Cal.Rptr. 183].) ▮▮▮ The fact, if it be a fact, that defendant was the owner of the lots from which he manufactured and sold the notes and trust deeds did not render the operation of the statute invalid as to him.[8] The purpose of the statute is to protect the unsuspecting public against the sale of worthless real estate securities, whether those securities be offered for sale by the owners of the lots or by others. This the Legislature may constitutionally do as it has in adopting regulations governing the sale of corporate securities (*People* v. *Craven,* 219 Cal. 522, 526-527 [27 P.2d 906]; *People* v. *Rankin,* 169 Cal.App.2d 150, 158-159 [337 P.2d 182]) and sale of subdivision lots (*In re Sidebotham, supra,* 12 Cal.2d 434, 436). Language to the contrary in *People* v. *Pace,* 73 Cal.App. 548 [238 P. 1089], cited by defendant has been properly characterized by our Supreme Court as language "not necessary to the decision." (*People* v. *Craven, supra,* 219 Cal. 522, 526.)

## III

Defendant's final contention is two-pronged: He urges (1) the indictment failed to charge a crime and (2) the People failed to prove criminal violations of the Act because the prosecution failed to prove a specific intent to violate the law.

The indictment charged defendant with two counts of violations of the Act for each sale: One count charged the "crime of violation of sec-

---

[8]It is doubtful that defendant can claim to have been the owner of the property when he sold the notes since he used the investors' money as part of the purchase price.

tion 10237.4" for "willfully and unlawfully" selling a real property security without delivering the purchaser a written statement containing the information required by section 10237.5 and one count charged the "crime of violation of section 10238.3" for "willfully and unlawfully" selling real property securities without a permit from the State Commissioner of Real Estate.

■ If we understand defendant's first point correctly, it takes the following form: Neither section 10237.4 (requiring certain information to be given to prospective purchasers) nor section 10238.3 (requiring a permit for sale of real property securities) provides a penal sanction for its violation; the only section making willful violation of any of the provisions of the Act a crime is section 10238.6;[9] since the indictment failed to make reference to section 10238.6, it failed to allege a crime. The contention is without substance.

In charging an offense, an indictment or information need only contain language sufficient to give the accused notice in substance of the offense with which he is charged. (Pen. Code, § 952;[10] *People* v. *Roberts,* 40 Cal.2d 483, 486 [254 P.2d 501]; *Patterson* v. *Municipal Court,* 17 Cal.

---

[9]Section 10238.6 provides: "Any person who does any of the following acts is guilty of a public offense punishable by a fine not exceeding five thousand dollars ($5,000) or by imprisonment in the state prison not exceeding five (5) years or in a county jail not exceeding one (1) year or by both such fine and imprisonment.

"(a) In any application to the commissioner or in any proceeding before him, or in any examination, audit or investigation made by him or on his authority, knowingly makes any false statement or representation, or, with knowledge of its falsity, files or causes to be filed in the office of the commissioner any false statement or representation in a required report.

"(b) Issues, circulates or publishes, or causes to be issued, circulated or published any advertisement, pamphlet, prospectus or circular concerning any real property security which contains any statement that is false or misleading, or otherwise likely to deceive a reader thereof, with knowledge that it contains such false, misleading or deceptive statement.

"(c) In any respect willfully violates or fails to comply with any provision of this article, or willfully violates or fails, omits or neglects to obey, observe or comply with any order, decision, demand, requirement or permit, or any part or provisions thereof, of the commissioner under this article.

"(d) With one or more other persons, conspires to violate any permit or order issued by the commissioner or any provision of this article."

[10]Penal Code section 952 provides: "In charging an offense, each count shall contain, and shall be sufficient if it contains in substance, a statement that the accused has committed some public offense therein specified. Such statement may be made in ordinary and concise language without any technical averments or any allegations of matter not essential to be proved. It may be in the words of the enactment describing the offense or declaring the matter to be a public offense, or in any words sufficient to give the accused notice of the offense of which he is accused. In charging theft it shall be sufficient to allege that the defendant unlawfully took the labor or property of another."

App.3d 84, 87 [94 Cal.Rptr. 449].) There is no requirement that in charging an offense reference must be made to the statute prescribing the penalty therefore. (*Rocklite Products* v. *Municipal Court,* 217 Cal. App.2d 638, 646 [32 Cal.Rptr. 183].) The indictment in question apprised defendant in clear and specific language that he was being charged with willful violations of the provisions of sections 10237.4 and 10238.3. It was unnecessary to allege section 10238.6 prescribing the punishment for willful violation of any of the provisions of the Act.

We turn to defendant's contention that the offenses of which he was convicted required proof of specific intent. He argues that the word "willfully" in section 10238.6 providing that any person who "[i]n any respect willfully violates or fails to comply with any provision" of the Act is guilty of a public offense makes specific intent an essential element of a criminal offense under the Act. This contention is equally devoid of merit.

The word "willfully" as used in section 10238.6 does not import the requirement of specific intent to violate the law. Penal Code section 7, subdivision 1, provides: "The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage; . . ." That definition has been applied to the word "willfully" not only when used in the Penal Code (*People* v. *Hayes,* 16 Cal.App.3d 662, 666 [94 Cal.Rptr. 222]; *People* v. *Haskins,* 177 Cal.App.2d 84, 88 [2 Cal.Rptr. 34]), but also when used in penal provisions of other codes as well. (See e.g., *Lyons* v. *Superior Court,* 43 Cal.2d 755, 759 [278 P.2d 681] [Code Civ. Proc.]; *People* v. *Gory,* 28 Cal.2d 450, 453 [170 P.2d 433] [Health & Saf. Code]; *People* v. *Reznick,* 75 Cal.App.2d 832, 838 [171 P.2d 952] [Welf. & Inst. Code]; *People* v. *Murphy,* 17 Cal.App.2d 575, 585 [62 P.2d 592] [Corp. Code].) Where an act is expressly prohibited by statute, particularly one enacted for the protection of public morals, public health and the public peace and safety, the intentional doing of the act, regardless of motive or ignorance of its criminal character, constitutes the offense denounced by law. (*People* v. *Gory, supra,* 28 Cal.2d 450, 453; 1 Witkin, Cal. Crimes, § 62, pp. 66-68.)

The judgment (order granting probation) is affirmed.

Gardner, P. J., and Kerrigan, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 31, 1974.