**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Edmer A. GOETZ, Defendant and Appellant.**

Cr. Nos. 771, 772.

Supreme Court of North Dakota.

Oct. 15, 1981.

On Rehearing Oct. 23, 1981.

Peter A. Quist and Joan B. Weiner, Asst. Attys. Gen., Bismarck, for plaintiff and appellee State of North Dakota; argued by Peter A. Quist, Bismarck.

Jonathan T. Garaas, of Garaas Law Firm, Fargo, for defendant and appellant.

VANDE WALLE, Justice.

Edmer Goetz appealed from a judgment of conviction of violating North Dakota securities laws entered after a jury trial in the district court of Burleigh County. We affirm.

## FACTS

Goetz was charged in two informations of offering for sale or selling securities when not registered as a dealer or salesman [Section 10–04–10, N.D.C.C.] and for offering for sale or selling unregistered securities [Section 10–04–04, N.D.C.C.]. Evidence was presented at trial that Goetz issued personal promissory notes for $83,000 to four persons in Burleigh County and another $78,000 to four other persons outside Burleigh County between February 1978 to August 1979. A certificate of the Securities Commissioner was introduced to show that neither Goetz nor his promissory notes were registered. Goetz was sentenced to concurrent five-year terms for each conviction, with three years of each sentence suspended.

Goetz raises 18 issues on appeal.

In the first issue he contends that the preliminary hearing was defective because there was only one witness, an investigator for the Securities Commissioner who subsequently became the prosecutor at trial. All parties conceded that this could have resulted in difficulty but nothing occurred at trial which created problems. Goetz also appears to be complaining that the State was not required to present its entire case at the preliminary hearing and therefore he did not know the nature of the charges against him. Rule 5.1(a) of the North Dakota Rules of Criminal Procedure requires a magistrate at a preliminary examination to hold a defendant for trial if "it appears from the evidence that there is probable cause to believe that an offense has been committed and that the defendant committed it, . . ." The testimony at the preliminary hearing indicated that Goetz had issued promissory notes for money to a number of persons in Burleigh County between February 1978 and August 1979 and that

neither Goetz nor the notes had been registered with the Securities Commissioner. Sufficient evidence was presented to allow the magistrate to conclude that an offense had been committed and that Goetz committed it.

Goetz also argues that the preliminary hearing was defective because of a lack of evidence that the promissory notes were securities. Section 10–04–02(12), N.D.C.C., contains the definition of "security":

> " 'Security' shall mean any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation, certificate of interest in oil, gas, or other mineral rights, collateral trust certificate, preorganization certificate or subscription, transferable share, investment contract, program, contract, *or other arrangement in which persons invest in a common enterprise the returns of which depend to any extent upon inducing other persons to participate or invest in the enterprise,* voting-trust certificate, or beneficial interest in title to property, profits or earnings, or any other instrument commonly known as a security, including any guarantee of, temporary or interim certificate of interest or participation in, or warrant or right to subscribe to, convert into, or purchase any of the foregoing." [Emphasis added.]

Goetz contends that the words "or other arrangement in which persons invest in a common enterprise the returns of which depend to any extent upon inducing other persons to participate or invest in the enterprise, . . ." state a condition which all securities must meet to come within this definition. Goetz argues that because there was no evidence at the preliminary hearing to satisfy this phrase the hearing was defective and no probable cause should have been found.

■ Goetz could have secured a review of the finding of probable cause by petitioning the district court for a writ of certiorari if he believed that the county judge had ex-

ceeded his jurisdiction in making a finding of probable cause. Sec. 32–33–09, N.D.C.C.; *State v. Morrissey*, 295 N.W.2d 307 (N.D. 1980). However, because Goetz raises the definition of "security" in other issues also, we will address his concern here.

■ The language cited by Goetz does not modify those words which precede it, as Goetz argues. The use of "or" does not transform that phrase into one which modifies or conditions the language before it. The definition lists various instruments which are considered to be "securities" for purposes of Chapter 10–04, N.D.C.C. Goetz's interpretation of the language in Section 10–04–02(12) would, as an example, result in requiring that the term "or other mineral rights" also modify or condition the language before it. We construed this definition in *State v. Weisser*, 161 N.W.2d 360 (N.D.1968), by concluding that a personal promissory note written on a standard note form furnished by the defendant, given in exchange for money, was a security: "A personal promissory note is a 'note' and also 'evidence of indebtedness' and included in the Securities Act of 1951." 161 N.W.2d at 365. Goetz, however, argues that *Weisser* is not dispositive because the language he cites was added after *Weisser* was decided. While the language was added after the *Weisser* decision, we do not believe that *Weisser* is so limited. The 1973 Legislature amended Section 10–04–02(12) by adding the words Goetz cites, among others. H.B. 1278 § 2, 1973 N.D.Sess.Laws Ch. 81. According to the minutes of the House Committee on Industry, Business, and Labor for February 20, 1973, the Securities Commissioner testified that the legislation was drafted by his office in order to close loopholes in the securities laws. The Securities Commissioner stated that the bill would better protect the investing public while not placing any undesirable obstacles in front of those seeking public money to finance legitimate business ventures.[1] This per-

---

1. A summary of the bill prepared by the Securities Commissioner's office which explained the amendment to the definition of "security" states that the addition of " 'program, contract, or other arrangement in which persons invest in a common enterprise the returns of which

suades us that *Weisser* was not changed by the 1973 amendment. The amendment added to the list of instruments which are securities; it did not modify nor restrict the instruments listed but rather increased the instruments included within the definition of "security."

■ Goetz's second issue is that "Both informations should have been dismissed in that more than one offense is charged therein." Rule 8(a), N.D.R.Crim.P., allows two or more offenses to be charged in the same information if they "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of the common scheme or plan." Testimony at the preliminary hearing indicated that Goetz had given promissory notes to several persons in exchange for money, the form of the notes was substantially the same, and that similar transactions were made by Goetz outside Burleigh County. The informations therefore complied with Rule 8(a).

Goetz's third issue is that the charges in the informations violate the equal-protection provisions of the United States and North Dakota Constitutions. U.S.Const. Amend. XIV, § 1; N.D.Const. Art. I, § 21. We do not agree. He argues that the classification system which exempts some transactions [Sec. 10–04–06, N.D.C.C.] and some securities [Sec. 10–04–05, N.D.C.C.] from registration is not rationally related to legitimate government objectives. He claims that the exemptions contained in the Securities Act do not promote the purpose of the Securities Act, which he argues is to protect the public from fraud.

■ The purpose of the Securities Act is not only to prevent fraud or deception but also to prevent the disposal of securities on unfair terms, or where the proposed plan of business appears to be unfair, unjust, or inequitable. Sec. 10–04–08.1, N.D.C.C. Within the Act is a three-part framework for protecting investors and the public. The first part regulates securities. It is unlawful to offer for sale or to sell securities in North Dakota unless they are either registered with the Securities Commissioner or are within an exemption. Sec. 10–04–04, N.D.C.C. The second part regulates the people who offer, sell, or provide security-investment advice. They must register with the Securities Commissioner unless a transactional exemption exists. Sec. 10–04–10, N.D.C.C. The third part prohibits fraud when securities are offered for sale, sold, or purchased, or when security advice is given. Secs. 10–04–10.1(1) and 10–04–15, N.D.C.C. Each serves different purposes. The part which regulates securities ensures that people receive relevant information about securities upon which they can base their investment decisions and protects investors from securities which do not meet statutory standards. The purpose of registering the people involved in security transactions is to prevent unqualified, unethical, and fraudulent persons from entering the securities business; to supervise the activities of persons in the securities business after they have registered; and to enforce the statutory standards by suspending or revoking registrations for noncompliance. The fraudulent-practices provisions give the Securities Commissioner a number of options to combat activities which are fraudulent. His actions may range from issuing public warnings and investigating activities suspected of being fraudulent to pursuing administrative actions or criminal prosecutions.

■ Some categories of securities and transactions are exempt from registration

---

depend to any extent upon inducing other persons to participate or invest in the enterprise.' . . . is patterned after that used in Senator John Tower's bill, S.B. 3983, which has been introduced in the U. S. Senate as a stop-gap measure to regulate pyramid sales schemes. *The reason for the inclusion of this language in our definition of 'security' is to make clear beyond reasonable dispute that an investment in a pyr-* *amid promotion is a security*, and, as such, subject to the registration and fraudulent practices provisions contained in the Securities Act. This amendment will provide some measure of protection against promotions such as Koscot Interplanetary and Dare To B Great, two of Glen Turner's enterprises which have taken a substantial toll in North Dakota." [Emphasis added.]

where the Legislature has concluded that registration is unnecessary for the protection of investors or the public. The classification is not based ·upon wealth, as Goetz argues, but upon other valid considerations. For example, Section 10–04–05(1), N.D.C.C., exempts from registration the securities issued or guaranteed by the United States or by States or their agencies or subdivisions. In subsection 2, securities issued by national and State banks are exempted because they already are subject to regulation. Those provisions are rationally related to the legitimate government objective of protecting investors in securities. *State v. Gamble Skogmo, Inc.*, 144 N.W.2d 749 (N.D.1966). It was long ago determined that equal protection is not violated by laws which regulate securities and provide for exemptions from regulation. *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480 (1917); *Caldwell v. Sioux Falls Stock Yards Co.*, 242 U.S. 559, 37 S.Ct. 224, 61 L.Ed. 493 (1917).

■ Goetz's fourth issue is that the statutes under which he was convicted are vague and thus violate due-process provisions of the United States and North Dakota Constitutions. Goetz was charged under Section 10–04–10, N.D.C.C., offering for sale or selling securities without being registered as a dealer or salesman; Section 10–04–04, N.D.C.C., offering for sale or selling unregistered securities; and Section 10–04–18, N.D.C.C., providing for penalties for willful violation. Although Section 10–04–10 has been amended to reflect registration requirements, its basic provision has been unchanged since *State v. Henderson*, 156 N.W.2d 700 (N.D.1968). In that case we held that Section 10–04–10, "when construed by the standards of commercial practice and common understanding, sets forth with reasonable clarity the proscribed conduct, and can be understood by the reasonable man." 156 N.W.2d at 706. In *Weisser* we held that the "[definitions in Section 10–04–02] . . . clearly provide that a note is a security and that every person who, for all or part of his time, engages in selling notes issued by such person is a dealer" and that "a personal promissory note is a

'note.'" 161 N.W.2d at 365. We also said that a sale or offer for sale exists when "the promissory notes in question were disposed of for value, and therefore, the transaction is covered under the broad definition of our statute. We hold that the transaction constituted a sale under the Securities Act of 1951." 161 N.W.2d at 366.

There can be no doubt that in North Dakota a promissory note is a "note" within the definition of a "security." Nor can there be any doubt about the meaning of the statute which requires the registration of dealers and salesmen [*Henderson, supra*]; nor that the act of disposing of promissory notes for value is a sale and thus within the provisions of the Securities Act [*Weisser, supra*]. After it has been established that the notes are securities there can be no question about the requirement for registering securities as found in Section 10–04–04, N.D.C.C. Its provisions are as straightforward and clear as Section 10–04–10, and it reads:

"It shall be unlawful to sell, or offer for sale, any securities in this state, except those exempt under section 10–04–04, those sold in transactions exempt under section 10–04–06, or those registered by description under section 10–04–07 or by announcement under section 10–04–07.1, unless such securities shall have been registered by qualification as hereinafter provided in section 10–04–08."

Unless exempted or otherwise excused from registration all securities must be registered. There is nothing vague about the statutes under which Goetz was convicted.

■ In the fifth issue Goetz claims the charges should have been dismissed due to discriminatory enforcement of the statutes. The basis of this claim is testimony by Arly Richau, the Securities Commissioner, at a hearing on Goetz's motion to dismiss. However, Goetz misinterprets the statements of the Securities Commissioner. Mr. Richau testified that when violations of Chapter 10–04 have been discovered, the policy of the Securities Commissioner is to seek criminal sanctions only when his office staff

believes that willful violation or fraud is involved. When the staff believes that neither willful violation nor fraud can be proved civil sanctions are sought. In the case of Goetz, the Securities Commissioner recommended that Goetz be charged with fraud. The State's Attorney chose not to follow that recommendation and instead charged Goetz with other violations of the Securities Act. There is nothing in the statements of the Securities Commissioner to indicate that Goetz was subject to discriminatory enforcement of the Securities Act.

The sixth issue is whether or not the trial court committed prejudicial error by denying Goetz's motion for a bill of particulars. Under Rule 7(f), N.D.R. Crim.P., a motion for a bill of particulars should be granted "if it appears to the court necessary to protect the defendant against a second prosecution for the same offense or to enable the defendant to adequately prepare for trial." It is for the second purpose that Goetz sought the bill of particulars. We do not believe that it was prejudicial error for the trial court to deny Goetz's motion. Goetz moved for a bill of particulars on May 30, 1980. On May 16, 1980, the State's Attorney's office provided Goetz with its file on the case. Everything that Goetz requested had already been provided him.

In the seventh issue Goetz contends that his conviction constitutes an unconstitutional imprisonment for debt. Goetz believes that he is being subjected to prosecution because he has filed for bankruptcy. This contention is without merit. His conviction had nothing to do with the fact that he has filed for bankruptcy nor that the notes were not paid when due but rather that he failed to comply with the Securities Act.

Neither do we find merit with Goetz's eighth issue. He argues that Chapter 10–04, N.D.C.C., violates Article I, Section 18, of the North Dakota Constitution, which prohibits laws impairing the obligations of contracts. The contracts which Goetz entered into have not been impaired by the Securities Act. It regulates the offer or sale of securities and those who offer or sell securities; it does not constitute an impairment.

The ninth issue attacks the exceptions and exemptions in the Securities Act as violating equal protection by granting special privileges to certain corporations. We do not agree. *Newman Signs, Inc. v. Hjelle*, 268 N.W.2d 741 (N.D.1978), summarizes a long line of cases which have dealt with equal protection and classifications in North Dakota: "[I]t is well settled that even a legitimate business may be regulated in the public interest." Also: "[T]he Legislature has broad discretion in making classifications, ..." 268 N.W.2d at 758. In determining whether or not a particular classification is unconstitutional the test is " 'a classification although discriminatory is not arbitrary nor violative of the Equal Protection Clause of the Fourteenth Amendment if any state of facts reasonably can be conceived that would sustain it.' " 268 N.W.2d at 758, quoting *Signal Oil and Gas Co. v. Williams County*, 206 N.W.2d 75, 83 (N.D.1973). Under Issue 3, *supra*, we discussed the purposes of the Securities Act. We find that they are reasonably related to the police power of the State to promote the general health, safety, and welfare.

In his tenth issue Goetz seeks to have us rule that the right to use commercial paper in a commercial setting is a fundamental right guaranteed by Article I, Section 1, of the North Dakota Constitution. We do not agree. That section reads:

"All men are by nature equally free and independent and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing and protecting property and reputation; and pursuing and obtaining safety and happiness."

Goetz cites 69 Am.Jur.2d, *Securities Regulation—State*, § 5, which discusses securities regulations which have been held unconstitutional in other States. The citation refers to *People v. Pace*, 73 Cal.App. 548, 238 P. 1089 (1925), and *People v. Lesser*, 123 Cal.

App. 489, 11 P.2d 668 (1932). *Pace* held as unconstitutional a provision of the California Corporate Securities Act requiring an owner who was not an issuer or underwriter to obtain a broker's permit when he sold his securities in repeated or successive transactions. 238 P. at 1091, 1096. Issuance of the permit was to some extent discretionary. Therefore, it was possible that an owner could be denied a permit. The result would be an absolute prohibition of the sale of an owner's securities. In *People v. Lesser*, the court expanded upon the result in *Pace*. After *Pace*, California rewrote the unconstitutional statute. It exempted from licensing "the sale in a bona fide way of any security by an owner who is not the issuer or an underwriter thereof, who sells the same for his own account; and not for the purpose of evading the provisions of this act." 11 P.2d at 669. The *Lesser* court held that "the Act under which defendant is charged is one avowedly seeking to regulate the sale of property, and, in so far as the regulation takes away the right of the owner to sell his own property, it is void." 11 P.2d at 670.

*Pace* and *Lesser*, however, contain important differences from this case. The defendant in *Pace* sold corporate stock which he had purchased from the corporation. The corporation had been granted permission by the Commissioner of Corporations in California to sell portions of its capital stock. The issue in *Pace* was "whether or not an individual, who is a bona fide owner of securities, may lawfully sell such securities, or any part of them, in repeated and successive transactions for like or similar character, without first complying with certain requirements of the Corporate Securities Act required of brokers, and without securing a broker's license." 238 P. at 1091. The defendant in *Lesser* also was charged with acting as a broker in the sale of stock of a corporation without being licensed as a broker. It was unquestioned that he sold his own stock. Although it is not clear from the decision, the stock he sold appears to have been registered; in any event, he was not charged with selling unregistered stock. The securities which Goetz is charged with selling were not registered. Goetz was the owner of the securities and also the issuer of them.

But those two cases are not authority for us to concur in their results because of subsequent treatment by the California Supreme Court. *People v. Craven*, 219 Cal. 522, 27 P.2d 906 (1933), limited *Pace* and *Lesser*. The *Craven* court rejected the argument that the Legislature of California had exceeded its powers and infringed upon the constitutional rights of persons to freely enjoy, possess, and dispose of property owned by them when it required an owner who also was the issuer of securities to register. The court decided that some regulation of the disposal of property was valid when it ruled that an owner-issuer could be required to register. The court ruled that *Pace* and *Lesser* were not controlling for two reasons: (1) The defendant in each case was not also an issuer of the stock which he sold; and (2) The *Pace* and *Lesser* courts did not decide:

"that an issuer of securities, even though he was the bona fide owner of the same, was not subject to the requirements of the Corporate Securities Act, requiring that such owner should secure a broker's license before making sale of such securities, as no such case was before the court on either occasion." 27 P.2d at 907.

*Craven* effectively negates the decision of *Pace* and *Lesser* concerning the constitutionality of the Corporate Securities Act:

"It is true that the court in the opinion in each of those two cases [*Pace* and *Lesser*] had much to say regarding the constitutionality of an act which would require a bona fide owner of securities to secure a broker's license before he could legally sell the same, but, in our opinion, *what was said by the court in that regard was not necessary to the decision in either case, nor was it applicable to the facts then before the court*." [Emphasis added.] 27 P.2d at 907–908.

California apparently has followed the *Craven* decision. In *People v. Mancha*, 39 Cal.App.3d 703, 114 Cal.Rptr. 392 (1974), the court rejected the defendant's contention

that a statute which regulated an owner's right to sell promotional notes violated the Due Process Clause of the Fifth and Fourteenth Amendments:

"The state in the exercise of its police power may regulate the enjoyment of property rights whenever reasonably necessary to the protection of the health, safety, morals or general well-being of the people." [Citations omitted.] 39 Cal. App.3d at 720, 114 Cal.Rptr. at 402.

Although *Mancha* involved a violation of the Real Property Securities Dealers Act, the principles of regulation are similar to the securities regulations dealt with in *Craven* and here. The statute in *Mancha* which regulated the sale of promotional notes was applied to the defendant even though he owned the real property which secured the notes: "This the Legislature may constitutionally do as it has in adopting regulations governing the sale of corporate securities (*People v. Craven, supra* [citations omitted]) . . ." *Mancha, supra*, 39 Cal.App.3d at 720, 114 Cal.Rptr. at 402.

Applied to Goetz, the result is that the cases he cited to support the contention that the securities regulations are unconstitutional have been severely limited and perhaps overruled. Those cases, even if precedential, dealt with owners who sold registered securities and who were not issuers of the securities they sold. An "issuer" in North Dakota is "every person who issues or proposes to issue any security, . . ." Sec. 10–04–02(4), N.D.C.C. Evidence at trial indicated that the notes Goetz sold were issued by him and were not registered as securities. *Pace* and *Lesser* are not applicable because they have been limited, they involved the sale of securities, and the defendants were not the issuers of that stock.

We do not agree with Goetz's eleventh issue, that the trial court committed prejudicial error when it instructed the jury that a promissory note was a security. The definition of "security" was discussed under his first issue. Notes are "securities" by definition as interpreted in *Weigel* and *Weisser, supra*. These two decisions make the issue a question of law and not of fact.

Goetz's twelfth issue is that the State should have been required to prove the nonexistence of an exemption. The jury was instructed that Goetz had the burden to prove the existence of an exemption by a preponderance of the evidence. The instruction is based upon Section 10–04–19(1), N.D.C.C.: "In any action, civil or criminal, where a defense is based upon any exemption provided for in this chapter, the burden of proving the existence of such exemption shall be upon the party raising such defense." Goetz argues that this is an unconstitutional shifting of the burden of proof to the defendant. The State's response is that the judge also instructed the jury that the State was required to prove the elements of its case beyond a reasonable doubt whether or not the defendant was able to prove an exemption. Goetz is mistaken in looking to Section 12.1–01–03(1) to support his claim that the State must prove the nonexistence of an exemption as an element of the crime charged. Elements of an offense in Section 12.1–01–03(1) include:

"e. the nonexistence of a defense as to which there is evidence in the case sufficient to give rise to a reasonable doubt on the issue."

Section 12.1–01–03 is a general provision applicable to the Criminal Code, whereas Section 10–04–19 is a specific provision applicable only to violations of the Securities Act. As a rule of interpretation Section 1–02–07 requires that where two statutes conflict the specific provision shall prevail over the general provision. Because Section 10–04–19 prevails over Section 12.1–01–03, the nonexistence of a defense is not an element of the offense.

In *People v. Dempster*, 396 Mich. 700, 242 N.W.2d 381 (1976), Dempster was convicted of selling unregistered securities. The court upheld a provision similar to Section 10–04–19(1) which required that a person who claimed an exemption had the burden of proving it. Dempster challenged the provision as an unconstitutional burden of requiring that he prove his innocence. The court ruled that this provision

"must be interpreted to mean that once the state establishes a prima facie case of statutory violation, the burden of going forward, i. e., of injecting some competent evidence of the exempt status of the securities, shifts to the defendant. However, once the defendant properly injects the issue, the state is obliged to establish the contrary beyond a reasonable doubt." 242 N.W.2d at 388.

The court in *Dempster* relied partially upon the decision in *United States v. Tehan*, 365 F.2d 191 (6th Cir. 1966), which upheld the constitutionality of a provision similar to the one Goetz challenges. Like Goetz, the defendant in *Tehan* was convicted of selling securities without a securities dealer's license and selling an unlicensed security. The security in *Tehan* was a promissory note payable in sixty days. *Tehan* upheld the provision in part due to language from *Morrison v. People of the State of California*, 291 U.S. 82, 88–89, 54 S.Ct. 281, 284, 78 L.Ed. 664, 669 (1934):

"The decisions are manifold that within limits of reason and fairness the burden of proof may be lifted from the state in criminal prosecutions and cast on a defendant. The limits are in substance these, that the state shall have proved enough to make it just for the defendant to be required to repel what has been proved with excuse or explanation, or at least that upon a balancing of convenience or of the opportunities for knowledge the shifting of the burden will be found to be an aid to the accuser without subjecting the accused to hardship or oppression."

.    .    .    .    .

"For a transfer of the burden, experience must teach that the evidence held to be inculpatory has at least a sinister significance [citations omitted] or, if this at times be lacking, there must be in any event a manifest disparity in convenience of proof and opportunity for knowledge, as, for instance, *where a general prohibition is applicable to every one who is unable to bring himself within the range of an exception.*" [Emphasis added.] 291

U.S. at 90–91, 54 S.Ct. at 285, 78 L.Ed. at 670–671.

In *Patterson v. New York*, 432 U.S. 197, 203, 97 S.Ct. 2319, 2323, 53 L.Ed.2d 281, 287–288 (1977), the Court reviewed *Morrison* and explained in footnote 9:

"that although the State could go too far in shifting the burden of proof to a defendant in a criminal case, the Due Process Clause did not invalidate every instance of burdening the defendant with proving an exculpatory fact. . . . [However,] . . . if the *Morrison* cases are understood as approving shifting to the defendant the burden of disproving a fact necessary to constitute the crime, the result in the first *Morrison* case [288 U.S. 591, 53 S.Ct. 401, 77 L.Ed. 970, where the Court held that there was no Due Process violation when the State required the defendant to prove what was in essence an element of the offense] could not coexist with *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and *Mullaney*."

*Patterson* held that "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged. Proof of the nonexistence of all affirmative defenses has never been constitutionally required; and we perceive no reason to fashion such a rule in this case . . ." 432 U.S. at 210, 97 S.Ct. at 2327, 53 L.Ed.2d at 292.

As the Court stated in *Tehan, supra*, "while the Ohio statute places the burden upon a defendant to avail himself of the exempt status, it does not diminish the proof necessary for conviction imposed upon the State. The burden remains with the State to offer proof of the essential elements of the indictment." 365 F.2d at 195–196. We find that the State did offer proof of every essential element of the offense and that the instruction to the jury did not shift to Goetz the burden of disproving an element necessary to constitute the crime.

In his thirteenth issue Goetz argues that the trial court erred in the way it defined "willfully." Part of his fourth issue was

that because there is no clear definition of "willfully" within the Securities Act, the term is vague and did not give him fair warning of prohibited conduct. In this issue he contends that even if it is not vague it was not defined correctly by the trial court. The State also argues that the trial court erred in its definition of "willfully." As we explain below, the instruction given was in Goetz's favor. Therefore, we need not decide whether or not the instruction was erroneous.

■ The problem exists because Section 10–04–18, N.D.C.C., contains the language "Any person who willfully violates any provision of this chapter ..." but does not define "willfully." Section 12.1–02–02(1), N.D.C.C., provides that for the purposes of Title 12.1, N.D.C.C., the Criminal Code, a person engages in conduct

"e. 'Willfully' if he engages in the conduct intentionally, knowingly, or recklessly."

Also defined in that section are the following:

"a. 'Intentionally' if, when he engages in the conduct, it is his purpose to do so.

"b. 'Knowingly' if, when he engages in the conduct, he knows or has a firm belief, unaccompanied by substantial doubt, that he is doing so, whether or not it is his purpose to do so."

The trial court used substantially the above-quoted language but deleted "recklessly." Goetz claims this to be error in view of our decision in *City of Dickinson v. Mueller*, 261 N.W.2d 787 (N.D.1977), and our decision in *State v. North Dakota Education Association*, 262 N.W.2d 731 (N.D. 1978). In *Mueller* we said that Section 12.-1–02–02(2) "applies only to the offenses or crimes described in Title 12.1, ..." 261 N.W.2d at 789. In *North Dakota Education Association* we said, "Section 12.1–02–02, N.D.C.C., is a part of a recodified criminal code, and applies only to that code. It does not apply to earlier statutes which were not repealed by the codification, such as the statute under consideration in this case." 262 N.W.2d at 734. Both *Mueller* and

*North Dakota Education Association* involved a prosecution for violation of a statute outside of Title 12.1. In each case the statute did not contain a culpability requirement and the defendant was attempting to incorporate subsection 2 of Section 12.1–02–02: "If a statute or regulation thereunder defining a crime does not specify any culpability and does not provide explicitly that a person may be guilty without culpability, the culpability that is required is "willfully." Neither *Mueller* nor *North Dakota Education Association* involved a statute which utilized "willfully" as a culpability requirement but failed to define it.

■ The issue can best be decided by analyzing the effect upon both the State and Goetz of the disputed instruction. The State has the heaviest burden of proof under our statutes when it prosecutes a violation of the Criminal Code which requires willful culpability. It is required to prove that the conduct was entered into intentionally, knowingly, or recklessly. The trial court's instruction defining "willfully" placed upon the State a greater burden of proof because "recklessly" was not included in the definition. Goetz was not harmed by the instruction. His treatment was similar to prosecution under the Criminal Code. The State argues, with some persuasiveness, that it should have been required to prove "willfully" only by showing that Goetz acted voluntarily or intentionally, and not accidentally. This would have placed a less strict requirement upon the State than did the instruction given.

Goetz argues that North Dakota Jury Instruction 1305 should have been given. That instruction contains a definition of "willfully" which is based upon Section 12–01–04. Most of Title 12, including Section 12–01–04, was replaced by Title 12.1. The instruction Goetz sought reads: "The term 'willfully,' when applied to the intent with which an act is done or omitted, implies not only a purpose or willingness to commit the act referred to, and distinguishes it from being accidentally or unintentionally done, but also implies a bad purpose or evil intent." NDJI 1305. His argument would

result in requiring proof of evil intent when prosecuting violations of the Securities Act; but, because of the definition in Section 12.1–02–02, proof of evil intent in prosecuting violations of the Criminal Code which involve willful culpability would not be required. We do not believe that the Legislature intended to require a more stringent showing of culpability in the prosecution of a violation of the Securities Act than for murder, for example. Section 12.1–16–01(1), N.D.C.C. Goetz's argument would lead to that result. Goetz benefited from the instruction given defining "willfully" because it required the State to prove "willfully" at or greater than the standard required under the Criminal Code.

The State also argues that the trial court erred by not using the definition of "willfully" it requested. The State's definition was not based upon North Dakota statutes or case law but upon the case law of other States. Goetz argues that the State's use of case law from other States strengthens his contention that the statute is unconstitutionally vague and does not provide an ascertainable standard of guilt which is necessary for a criminal statute to stand when attacked. *State v. Hanson*, 256 N.W.2d 364, 366 (N.D.1977). Goetz admits that this court might add a clarifying gloss "and thereby provide constructive notice to future defendants but such clarifying gloss by the courts should not be applied retroactively." Goetz argues that he should not be held to notice of the decisions of courts in other States.

■ Generally, Goetz is mistaken that he cannot be held to notice of decisions of other courts. A rule of interpretation in North Dakota is that a provision of the Code "which is part of a uniform statute shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it." Sec. 1–02–13, N.D.C.C. In *State v. Wells*, 276 N.W.2d 679 (N.D.1979), we said:

"Generally, where the Legislature adopted a federal statute there is a presumption the Legislature intended to accomplish purposes and objectives similar to those of the Congress which enacted the law. Also, where the statute has been construed by the federal courts before the Legislature adopted the statute it is presumed that the Legislature adopted the statute with the construction placed upon it by the federal courts. However, where the statute adopted has not been interpreted and construed by the federal courts at the time of the enactment by the Legislature, subsequent interpretation or construction by the federal courts will not be controlling but may be persuasive." 276 N.W.2d at 691.

We have used the decisions of Federal courts when our own statutes were similar to the Federal statutes. Our decision that the definition of "security" included personal promissory notes was first announced in *State v. Weisser, supra*. Part of the reasoning which led to that conclusion was based upon Federal decisions which construed the word "security" as contained in the Securities Act of 1933. 161 N.W.2d at 365–366.

■ North Dakota's current Securities Act was adopted in 1951. The Uniform Securities Act was not approved by the National Conference of Commissioners on Uniform State Laws until 1956. However, both the North Dakota Act and the Uniform Act drew heavily from the Federal Securities Act of 1933.[2] In addition, Section 10–04–03(2) provides: "The [State Securities] commissioner shall cooperate with the administrators of the securities laws of other states and of the United States with a view toward achieving maximum uniformity in the interpretation of like provisions of the laws administered by them and in the forms which are required to be filed under such law." We find persuasive the Federal and State court cases which have decided that proof of evil intent is not required to

---

**2.** Although the North Dakota Act drew heavily from the Federal Securities Act there were also substantial differences between the two Acts. Those differences are not significant to the is-

sues in this case. Additional amendments have been made to the North Dakota Securities Act since 1951.

show a willful violation under similar provisions of securities laws.

In *United States v. Sussman*, 37 F.Supp. 294 (E.D.Pa.1941), the Court held that actual knowledge that a security was being sold in violation of the law was not an element of a willful violation of the Securities Act of 1933. 37 F.Supp. at 296. In *Sussman*, the defendant was charged with violation of 15 U.S.C. § 77e(a)(1) and (2), prohibiting the use of the mails and interstate commerce to sell unregistered securities. Under 15 U.S.C. § 77x, penalties are imposed against "any person who willfully violates any of the provisions of this title." This scheme is similar to Section 10–04–04, N.D. C.C., which makes unlawful the sale of any securities except those exempted, etc. A later provision, Section 10–04–18, states that any "person who willfully violates any provision of this chapter . . . shall be guilty of a class B felony." The Federal rule prior to North Dakota's adoption of the Securities Act in 1951 was that actual knowledge of a violation, or intent, was not required.

The court in *People v. Terranova*, 38 Colo. App. 476, 563 P.2d 363 (1977), faced the same problem as is presented here. The defendant was convicted of selling unregistered securities and selling securities without a license, among other crimes. The trial court ruled that under the Uniform Securities Act, which Colorado has adopted, intent to deceive, manipulate, or defraud was not an element of the above-described charges. On appeal the Colorado Supreme Court agreed that only a general intent need be shown. The court discussed the similarity of Colorado statutes to the Securities Act of 1933. It also discussed the Federal cases which have dealt with the "willfully" requirement. It concluded that although the cases are split under the Federal Act, the better-reasoned rule was that in *United States v. Custer Channel Wing Corp.*, 376 F.2d 675 (4th Cir. 1967):

"There the court held that in a direct criminal prosecution or in a proceeding for injunctive relief, it is 'sufficient to show that the act of selling unregistered stock was willful and intentional, without the necessity of showing evil purpose or bad motive with specific intent to violate the law . . . .' " 563 P.2d at 367.

The *Terranova* court concluded that as to the charges of selling unregistered securities and selling securities without a license "state of mind is of as little relevance in a charge of sale of an unregistered security by an unlicensed person . . . as it would be in a prosecution for a speeding violation." 563 P.2d at 367.

If the instruction given was error, it was an error which favored Goetz and he cannot use such an argument to overturn his conviction. *State v. Folk*, 278 N.W.2d 410, 415 (N.D.1979).

As his fourteenth issue, Goetz claims it was error for the judge to instruct the jury that, "If you find that the defendant intended to renew the notes issued by him rather than to pay them upon maturity, and that he did renew several notes for additional years in accordance with his intention, then you may conclude that the notes had a maturity exceeding one year, even though the notes recited that they were payable one year after date of issue." The instruction refers to Section 10–04–05(7), N.D.C.C., which describes a type of security which is exempt from registration:

"7. "Any note, draft, bill of exchange, or bankers' acceptance which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, is not the subject of a public offering, has at the time of issuance a definite maturity (after all days of grace, if any) of not exceeding one year, is payable in cash only, and is not convertible into and does not carry an option or right to receive payment or any bonus in any other security."

Goetz claims that this instruction places an impossible burden upon him to prove not only an exemption but also that it was not his intent to renew the note when he made it. He further claims that all that is required to come within this exemption is a note which facially complies with the statute. We do not agree.

If facial compliance and nothing more were required, Section 10–04–05(7), N.D.C.C., would provide a method of circumventing the purposes of the Securities Act. If Goetz's argument were to prevail, one need only issue a note which provided for maturity within one year. The note then would be exempt from registration regardless of the issuer's intent to renew the note at the time of issue or regardless that the note was in fact renewed. We do not believe that the Legislature intended this provision to allow that result. Because the Securities Act was enacted to protect investors and the public, we must construe its terms to effectuate that end. Testimony revealed that the witnesses who purchased Goetz's notes believed that they were investing in one or more of his businesses or did so because they were promised a higher rate of interest than they could obtain elsewhere. Either of these two reasons is sufficient to include this type of transaction within the coverage of the securities laws and preclude the exemption under Section 10–04–05(7), N.D.C.C. Goetz was not unsophisticated. He testified that he: had a high school education; received a degree from Capital Commercial College which required study of business administration, accounting, and law; is licensed and bonded as a real estate broker, an auctioneer, a clerk, and a contractor; is qualified as an appraiser; and worked in farming and trucking businesses. He also testified that he had attended real estate seminars, taught real estate salesmen and brokers, and wrote a book on general real estate in Arizona.

Evidence at trial revealed that four notes had been renewed. Testimony from one witness showed that Goetz intended to repay the principal only after four to seven years from the date of issuance. This further supports the conclusion that these were investments of the type the Securities Act intended to regulate.

As his fifteenth issue, Goetz claims reversible error was committed when the trial court refused his motion for a mistrial after the prosecution said in its opening statement:

"There is really no dispute that the defendant did not register himself or his promissory notes, the question is: Should he have?"

As we discussed in the fourth issue, the notes were securities as a matter of law. *Weisser, supra.* Once the prosecution proved the sales of the notes, only the issue of whether or not an exemption applied to Goetz remained. The prosecution's statement, "Should he have [registered himself or his promissory notes]?" states that result. We do not agree that prejudicial error was committed.

Goetz's sixteenth issue is that allowing testimony which established that he exchanged a note for money outside Burleigh County was error. Goetz's argument that the jury may have convicted him of the charge of dealing in securities in Burleigh County for a note issued in another county is conjecture and we find no error.

We do not believe that Goetz's seventeenth issue has merit. He claims that it was error to allow a certificate of nonregistration from the Securities Commissioner into evidence. However, Section 10–04–19(2), N.D.C.C., states:

"2. In any action, civil or criminal, a certificate signed and sealed by the commissioner, stating compliance or noncompliance with the provisions of this chapter, shall constitute prima facie evidence of such compliance or noncompliance with the provisions of this chapter and shall be admissible in any such action."

Rule 803(10) of the North Dakota Rules of Evidence provides:

"(10) *Absence of public record or entry.* To prove the absence of a record, report, statement, or data compilation, in any form, or the nonoccurrence or nonexistence of a matter of which a record, report, statement, or data compilation, in any form, was regularly made and preserved by a public office or agency, evidence in the form of a certification in accordance with Rule 902, or testimony, that diligent search failed to disclose the

record, report, statement, or data compilation, or entry."

These two provisions permit what Goetz complains was error.

 In his last issue Goetz complains of a violation of his constitutional right to a speedy trial. The trial was originally set for August 19, 1980. Upon defense counsel's request it was postponed until October 1, 1980. On September 5, 1980, the State requested rescheduling of the trial. On September 30, 1980, the judge rescheduled the trial for December 2, 1980. On November 13, 1980, the judge granted the defendant's request and rescheduled the trial for January 13, 1981. Although one of the delays in trial was at the request of the State, we do not conclude that one delay violated Goetz's right to a speedy trial.

The judgment of conviction is affirmed.

ERICKSTAD, C. J., and SAND, PAULSON and PEDERSON, JJ., concur.

## ON PETITION FOR REHEARING

VANDE WALLE, Justice.

Goetz has filed a petition for rehearing in which he argues vigorously that our decision will create economic chaos in North Dakota. He urges that we distinguish between a promissory note which is an "investment" and a promissory note which is a "commercial note," the former to be considered a security governed by the securities laws and the latter to be considered a loan exempted from the requirements of the securities statutes. If this distinction is made the question of whether a note is an investment or a loan then becomes a question of fact for the jury and an instruction that a note is a security would be erroneous.

Goetz cites several cases construing the Federal Securities Act as well as certain cases construing statutes in States which have adopted the wording of the Federal Securities Act. We agree those cases recognize the distinction urged by Goetz. However, as we noted in our previous opinion, the language added to the definition of "security" by our Legislature was not intended to reach that result. More important, however, the cases cited involve statutes which contain an exemption in the definition of "sale" which dictates such result. Thus in *People v. Breckenridge*, 81 Mich.App. 6, 263 N.W.2d 922 (1978), the Michigan Court of Appeals reversed a conviction of the violation of that State's securities Act because the notes in that instance constituted a loan which by definition was exempt from the Act. The basis for that conclusion was the definition of "sales" contained in the Act. That definition excluded from the term "sale" "any bona fide pledge or loan." M.C.L.A. § 451.801(j)(6)(A); M.S.A. § 19.776(401)(j)(6)(A). An examination of the definition of "sale" as used in our Securities Act, Section 10-04-02(7), N.D.C.C., contains no such exemption. If, indeed, the consequences of our opinion are as dire as Goetz contends, it is a matter which should be presented to the Legislature for its consideration.

The petition for rehearing is denied.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.