MEADOW FRESH FARMS, INC., Plaintiff, Appellant and Cross Appellee,

v.

Dale V. SANDSTROM, as North Dakota Securities Commissioner, Defendant, Appellee and Cross Appellant.

In the Matter of Meadow Fresh Farms, Inc., David R. Ashby; TRA, Inc., Individually and d/b/a Meadow Fresh Distributors; Daniel P. Ryan; LaDarana Mees a/k/a Whitey Mees; Norman A. Shirley; and Their Directors, Officers, Employees, Agents and All Other Persons in Active Consort or Participation with Any of Them.

Civ. No. 10296.

Supreme Court of North Dakota.

April 25, 1983.

Zuger & Bucklin, Bismarck, for plaintiff, appellant and cross appellee; argued by Lyle W. Kirmis, Bismarck.

Joan B. Weiner, Asst. Atty. Gen., Securities Com'n, Bismarck, for defendant, appellee and cross appellant; argued by Joan B. Weiner, Asst. Atty. Gen., Bismarck.

ERICKSTAD, Chief Justice.

The North Dakota Securities Commissioner, in an order dated December 29, 1981, determined that Meadow Fresh Farms, Inc. (Meadow Fresh) had offered and sold unregistered securities in violation of the North Dakota Securities Act, Chapter 10–04, N.D.C.C. The Commissioner further determined that Meadow Fresh had offered and sold unregistered franchises in violation of the North Dakota Franchise Investment Law, Chapter 51–19, N.D.C.C. The Commissioner ordered Meadow Fresh to cease and desist from offering and selling securities and franchises in violation of the foregoing statutory provisions.

Meadow Fresh appealed to the district court under the Administrative Agencies Practice Act, Chapter 28–32, N.D.C.C. The district court entered its judgment on July 6, 1982, affirming the Commissioner's determination that Meadow Fresh had offered and sold securities in violation of Chapter 10–04, N.D.C.C., but reversing the Commissioner's determination that Meadow Fresh had offered and sold franchises in violation of Chapter 51–19, N.D.C.C. Meadow Fresh has appealed from that part of the district court's judgment affirming the Commissioner's order and the Commissioner has filed a cross-appeal from that part of the judgment reversing the Commissioner's order.

Meadow Fresh is a Utah corporation which is engaged in the distribution of dry milk alternate products through a multi-level marketing plan. A direct distributor of Meadow Fresh products receives a commission (selling price minus wholesale price of the product) on all products sold by the distributor. In addition, each direct distributor receives an "override bonus" on sales made by persons sponsored by the distributor and on sales made by other persons within the distributor's sponsorship chain. A sponsor can recruit another person to become a distributor by having that person purchase a $3.50 literature package. The new distributor can sell Meadow Fresh products through his sponsor but cannot sell

products directly or receive a commission until he becomes a direct distributor. A new distributor becomes a direct distributor when he has sold $120.00 of products through his sponsor and has submitted a $25.00 "Bookkeeping Entry Fee" to Meadow Fresh.

On appeal Meadow Fresh has raised the following issues:

(1) Whether or not the Commissioner erred in his determination that Meadow Fresh has offered and sold unregistered securities in violation of Chapter 10–04, N.D.C.C.; and

(2) Whether or not the Commissioner denied Meadow Fresh a fair hearing.

On his cross-appeal the Commissioner has raised the following issue:

Whether or not the Commissioner erred in his determination that Meadow Fresh had offered and sold unregistered franchises in violation of Chapter 51–19, N.D.C.C.

■ The standard this Court must use in reviewing a judgment of the district court in an appeal from a decision of an administrative agency is provided under Section 28–32–19, N.D.C.C., which states in relevant part:

"[T]he court shall affirm the decision of the agency unless it shall find that any of the following are present:

1. The decision or determination is not in accordance with the law.

2. The decision is in violation of the constitutional rights of the appellant.

3. Provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions and decision of the agency are not supported by its findings of fact."

In *Power Fuels, Inc. v. Elkin,* 283 N.W.2d 214 (N.D.1979), this Court clarified its scope of review of fact findings by an administrative agency under the "preponderance of the evidence" standard:

"[W]e do not make independent findings of fact or substitute our judgment for that of the agency. We determine only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record." 283 N.W.2d at 220.

After an investigation and hearing, the Commissioner determined that Meadow Fresh was offering and selling securities in violation of the registration requirements under Chapter 10–04, N.D.C.C. Meadow Fresh asserts that its operation does not constitute an offering or sale of securities.

The Commissioner made a finding that a person must purchase $120.00 of Meadow Fresh products to become a distributor of the products. Meadow Fresh asserts that prior to September 1, 1981, the marketing plan did require a $120.00 purchase of products as a prerequisite to becoming a direct distributor, but since that date such a purchase is not required and a person can become a direct distributor by selling $120.00 of products to others through his sponsor in addition to submitting a $25.00 fee to Meadow Fresh. Meadow Fresh explained the marketing plan changes in a letter to its distributors:

"1. NEW DISTRIBUTORS:

As of September 1, a person may become a distributor by simply executing a distributors application and submitting it to the company, along with $3.50 for the Literature packet. No product purchase is required.

"2. DIRECT DISTRIBUTOR:

Once a distributor has sold $120.00 of Purchase Volume through his sponsor, (no time limit) he or she may become a Direct Distributor. The sponsor will execute a Direct Distributor Certification form—submit it to the company along with a $25.00 Bookkeeping Entry Fee. The new Direct Distributor will then be assigned an I.D. number and his name placed in the computer. He

may now begin to sponsor distributors. At this point, his purchase will be made directly from the company at a 25% discount."

There is no evidence in the record that, contrary to Meadow Fresh's written policy, a person would be denied the right to be a direct distributor because he sold $120.00 of products to others through his sponsor instead of purchasing that amount of product himself. Although there is evidence that one or more individual distributors, subsequent to September 1, 1981, have requested new distributors to purchase $120.00 of product to become direct distributors, we do not believe a reasonable person could find by a preponderance of evidence that, subsequent to September 1, 1981, as a prerequisite to becoming a direct distributor, a new distributor must himself purchase $120.00 of product. Nevertheless, we do not believe that the question of whether a new distributor must himself purchase or instead must sell to others $120.00 of product to become a direct distributor is dispositive of whether or not Meadow Fresh is engaged in the offer and sale of securities under Chapter 10–04, N.D.C.C.

A security is defined in relevant part under Subsection 10–04–02(12), N.D.C.C., as:

"[A]ny ... arrangement in which persons invest in a common enterprise the returns of which depend to any extent upon inducing other persons to participate or invest in the enterprise, ..."

In *State v. Goetz*, 312 N.W.2d 1 (N.D.1981), *cert. denied*, 455 U.S. 924, 102 S.Ct. 1286, 71 L.Ed.2d 467 (1982), we explained that the purpose of adding the foregoing language to the definition of security under the Securities Act was to regulate pyramid sales schemes:

"A summary of the bill prepared by the Securities Commissioner's office which explained the amendment to the definition of 'security' states that the addition of ' "program, contract, or other arrangement in which persons invest in a common enterprise the returns of which depend to any extent upon inducing other persons to participate or invest in the enterprise." ... is patterned after that used in Senator John Tower's bill, S.B. 3983, which has been introduced in the U.S. Senate as a stop-gap measure to regulate pyramid sales schemes. *The reason for the inclusion of this language in our definition of "security" is to make clear beyond reasonable dispute that an investment in a pyramid promotion is a security,* and, as such, subject to the registration and fraudulent practices provisions contained in the Securities Act. ... ' " 312 N.W.2d at 4–5, fn. 1.

It is undisputed in this case that to become a distributor of Meadow Fresh products a person must initially submit $3.50 for a literature packet and to become a direct distributor a person must submit a $25.00 fee to Meadow Fresh. We believe those payments constitute an investment in an enterprise under the Subsection 10–04–02(12), N.D.C.C., definition of security.

■ To constitute a security under Subsection 10–04–02(12), N.D.C.C., there only need be an arrangement in which the returns of persons investing in a common enterprise depend "to any extent" upon inducing other persons to participate in the enterprise. The Commissioner found that a distributor's success in the Meadow Fresh program depends "on inducing other persons to participate in the multi-level distribution plan." Although a distributor's success in the program may not depend *solely* on recruiting other persons to distribute the product, we do not believe that it can reasonably be disputed on the record before us that a Meadow Fresh distributor's success is dependent to some extent upon sponsoring other persons to sell the product.

■ The purpose of the North Dakota Securities Act is to protect the investing public from fraud, deception, and the disposal of securities where the proposed plan of business appears to be unfair, unjust, or inequitable. Section 10–04–08.1, N.D.C.C. The act should be liberally construed toward accomplishing those objectives. *See, State v. Goetz,* 312 N.W.2d 1 (N.D.1981), *cert. denied,* 455 U.S. 924, 102 S.Ct. 1286, 71

L.Ed.2d 467 (1982); *State v. Weigel,* 165 N.W.2d 695 (N.D.1969); Section 1–02–01, N.D.C.C. Accordingly, we conclude that the Commissioner's determination that the Meadow Fresh operation is an arrangement which constitutes a security as defined under Subsection 10–04–02(12), N.D.C.C., is a proper interpretation and application of that law.

Meadow Fresh also asserts on appeal that it was denied a fair hearing because the Commissioner was "totally prejudiced against Meadow Fresh" and because the Commissioner acted "not only as judge, but also investigator and prosecutor in connection with the hearing."

■■■ A person is not denied due process of law or a fair administrative hearing merely because an administrative agency performs all three functions of investigation, prosecution, and adjudication. *See, First American Bank and Trust Company v. Ellwein,* 221 N.W.2d 509 (N.D.1974), *cert. denied,* 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301 (1974), *reh'g denied,* 419 U.S. 1117, 95 S.Ct. 798, 42 L.Ed.2d 816 (1975). Regarding the due process to which a person is entitled in administrative proceedings, we stated in *Ellwein, supra:*

> "[T]he minimal due process that must be afforded participants before an administrative board is not synonymous with the minimal requirement of due process in a court of law. The fundamental requirement of due process is the opportunity to be heard. . . . Our trust must be in the integrity of legally constituted boards to act upon the evidence alone. Judicial review of those actions is the ultimate due process protection accorded those aggrieved." 221 N.W.2d at 517.

Having reviewed the record in this case, we conclude that the Commissioner's actions do not demonstrate a prejudice which resulted in the denial of a fair hearing to Meadow Fresh.

In his order of December 29, 1982, the Commissioner ordered Meadow Fresh to cease and desist from offering for sale unregistered franchises in violation of Chapter 51–19, N.D.C.C. On appeal the district court determined that Meadow Fresh was not engaged in the offer or sale of franchises, and the court reversed that part of the Commissioner's order. The Commissioner cross-appealed from that part of the district court's judgment.

Subsection 51–19–02(5)(a), N.D.C.C., defines the term "franchise" under the Franchise Investment Law:

> "5. a. 'Franchise' means a contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which:
>
> (1) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor;
>
> (2) The operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and
>
> (3) The franchisee is required to pay, directly, or indirectly, a franchise fee."

Meadow Fresh asserts that it is not a franchise, as defined under Chapter 51–19, N.D.C.C., because Meadow Fresh distributors do not operate "under a marketing plan or system prescribed in substantial part" by Meadow Fresh. The Commissioner found that Meadow Fresh distributors did operate under a marketing plan prescribed in substantial part by Meadow Fresh. Meadow Fresh refers to its "Marketing Plan" in its distributor applications and in its Meadow Fresh Marketing Highlights and Regulations. There is substantial evidence that the marketing plan or system provided by Meadow Fresh encompasses the following matters:

(1) A detailed compensation and bonus structure for distributors selling Meadow Fresh products;

(2) A centralized bookkeeping and record keeping computer operation for distributors;

(3) A prescribed scheme through which a person can become a distributor, direct distributor, district director, regional director, and zone director for Meadow Fresh;

(4) A reservation by Meadow Fresh of the right to screen and approve all promotional materials used by distributors;

(5) A prohibition on repackaging of Meadow Fresh products by distributors;

(6) Assistance by Meadow Fresh to its distributors in conducting "opportunity meetings";

(7) Suggested retail price of products by Meadow Fresh; and

(8) A comprehensive advertising and promotional program by Meadow Fresh.

We conclude that there is a preponderance of evidence upon which the Commissioner could find that distributors sell Meadow Fresh products under a marketing plan or system prescribed in substantial part by Meadow Fresh.

Meadow Fresh also asserts that its operation does not constitute a franchise under Chapter 51–19, N.D.C.C., because distributors are not required to pay a franchise fee. The term "franchise fee" is defined under Subsection 51–19–02(6), N.D.C.C.:

"6. 'Franchise fee' means any fee or charge that a franchisee or sub-franchisor is required to pay or agrees to pay for the right to enter into a business under a franchise agreement, including, but not limited to, any such payment for such goods and services. However, the following shall not be considered the payment of a franchise fee:

a. The purchase or agreement to purchase goods at a bona fide wholesale price if no obligation is imposed upon the purchaser to purchase or pay for a quantity of such goods in excess of that which a reasonable businessman normally would purchase by way of a starting inventory or supply or to maintain a going inventory or supply.

b. The payment of a reasonable service charge to the issuer of a credit card by an establishment accepting or honoring such credit card.

c. Amounts paid to a trading stamp company by a person issuing trading stamps in connection with the retail sale of merchandise or services.

d. Any other consideration which the commissioner by rule excludes from 'franchise fee'."

The term franchise fee under Chapter 51–19, N.D.C.C., is very broadly defined to mean "any fee or charge ... for the right to enter into a business" with certain narrowly prescribed exceptions. It is undisputed that in order to become a Meadow Fresh distributor a person must pay $3.50 for a literature package and to become a direct distributor must submit $25.00 to Meadow Fresh as a "Bookkeeping Entry Fee." We believe that those charges, which are not expressly excepted as franchise fees under Subsection 51–19–02(6), N.D.C.C., constitute a franchise fee for purposes of Chapter 51–19, N.D.C.C. We conclude that there is a preponderance of evidence upon which the Commissioner could find that Meadow Fresh distributors are required to pay a franchise fee.

Accordingly, we conclude that the Commissioner's determination that Meadow Fresh has offered and sold unregistered franchises in violation of Chapter 51–19, N.D.C.C., is a proper interpretation and application of the Franchise Investment Law.

We affirm that part of the district court's judgment affirming the December 29, 1981, order of the Commissioner requiring Meadow Fresh to cease and desist from offering and selling unregistered securities in violation of Chapter 10–04, N.D.C.C. We reverse that part of the district court's judgment which set aside the Commissioner's order of December 29, 1981, requiring Meadow Fresh to cease and desist from offering and selling franchises in violation of Chapter 51–19, N.D.C.C.

VANDE WALLE, PEDERSON and SAND, JJ., and BEEDE, District Judge, concur.

BEEDE, D.J., sitting in place of PAULSON, J., disqualified.